IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 1, 2005

## STATE OF TENNESSEE v. HARLEN ROY L. ZIRKER, aka ANTHONY LAMONT ZIRKER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-C-1408     Seth Norman, Judge**

_____

**No. M2003-02546-CCA-R3-CD - Filed May 12, 2005**

_____

The defendant, Harlen Roy L. Zirker, aka Anthony Lamont Zirker,[1] was convicted by a Davidson County jury of two counts of rape of a child, a Class A felony, and four counts of aggravated sexual battery, a Class B felony, and received an effective sentence of seventy-two years. The defendant raises the following issues on appeal: (1) whether the evidence is sufficient to support his convictions; (2) whether the trial court erred in denying his motion to strike two jurors for cause, in admitting evidence of the defendant's prior criminal convictions, and in imposing consecutive sentences. Following our review, we affirm the convictions and sentences.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

G. Kerry Haymaker, Nashville, Tennessee, for the appellant, Harlen Roy L. Zirker, aka Anthony Lamont Zirker.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Sarah Davis and Bernard McEvoy, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

---

[1] In the record, the defendant's name is spelled "Harlan" and "Harlen;" therefore, we will utilize the spelling contained in the indictment.

The defendant's stepdaughter, B.W.,[2] who was twelve years old at the time of the trial, testified that she is the oldest of four children and lives with her mother and siblings in Nashville. After identifying male and female body parts, including genitalia, on two photographs, the victim was questioned about the instances of sexual contact, which included oral sex, masturbation, and vaginal intercourse, between herself and the defendant. After differentiating between "good touches" and "bad touches," the victim stated that the defendant had given her "bad touches" in the past. B.W. testified to at least three distinct instances of sexual contact between herself and the defendant, which began when she was in kindergarten and ended when she was in the fifth grade.

B.W. testified that when she was ten years old and in fifth grade, the defendant took her and her siblings to the hospital after her youngest brother was born on January 20, 2000.[3] After visiting a short time, they returned home, where the defendant sent the children upstairs but called B.W. back downstairs and told her to go into the bathroom and take off her clothes. The defendant was sitting on the toilet with his clothes off, and after B.W. took off her clothes, he told her to "get up on [her] knees," which she knew to mean "put his penis in [her] mouth." B.W. recounted what happened after the defendant told her to get up on her knees: "He put his penis inside my mouth and then he had told me to put my hand up on it and move it up and down and when he got through with that some kind of salty stuff had got in my mouth and he told me to spit it in the commode." When her hand was on the defendant's penis, the defendant "took [her] hand and made it move up and down." While B.W. was masturbating the defendant, he touched her breasts. The defendant's penis hurt B.W.'s throat and made her feel like she was "about to be sick." She did not know what came out of his penis, but she testified that it was "clear" and it tasted "salty" and that she spit it out of her mouth and into the toilet because the defendant told her to. She stated the defendant told her "every time" to spit it into the toilet, and on one occasion when she "was about to spit it in the trash can," the defendant "got mad" and told her to spit it in the toilet. After spitting into the toilet on this occasion, the defendant told B.W. to sit on his lap. Although she did not want to, she complied because the defendant was "mean." B.W. testified as to what happened next: "He told me to sit on his lap and then he put his penis inside of me and then he put his hands on my waist and then he started making me go up and down." She was facing the defendant and his penis was "hard" and made B.W.'s vagina and stomach hurt, and she felt "kind of sick." The encounter was cut short when B.W.'s sister, A.Z.,[4] turned the doorknob on the bathroom: "My little sister had came down stairs and she was about to come into the bathroom and then he had pushed me off his lap and told me to put my clothes on. And he had zipped his pants back up and he told her to go up stairs [sic] and then he shut the door behind him and he went up stairs [sic]." B.W. stated that A.Z. saw her naked and on the floor where the defendant had pushed her before the defendant told A.Z. to go back upstairs. B.W. "didn't like" having sex with the defendant and knew "[i]t was wrong." However, she never told her mother because the defendant said he would "hurt" or "kill" her. She was also

[2]It is the policy of this court to refer to minor victims of sexual abuse by their initials.

[3]The victim's mother testified that the youngest brother was born on January 20, 2001.

[4]From the record, we cannot determine the last name of the victim's sister. However, since the defendant testified that the sister is his child, we will refer to her as "A.Z."

afraid the defendant would hurt her mother. This was the final sexual encounter between the defendant and the victim.

B.W. also testified concerning her first sexual encounter with the defendant. When she was five years old and in kindergarten, she was outside playing with her siblings. Her mother had gone to work, and B.W. went inside and told the defendant her back teeth were hurting "real bad." The defendant was sitting on the bed and had B.W. get on her knees on the floor. He then put his penis in her mouth and said, "[T]his is what the dentist does to you." His penis was "hard" and felt "[h]eavy" in her mouth. B.W. also recalled what the defendant did when his penis was in her mouth: "He had took his hand and put in on the back of my head and started making my head" move back and forth. The defendant also had her touch his penis with her hand and made her move it up and down. She also did not tell her mother about that incident because the defendant said he would hurt her or her mother.

When B.W. was in third grade, the defendant came into her bedroom when she was asleep and sat on her bed. He told her to get out of the bed and get on her knees and open her mouth. She then sucked the defendant's penis and touched it with her hand.

A short time after the final incident, A.Z. told their grandmother about what she had seen between B.W. and the defendant. B.W.'s grandmother then asked B.W. what the defendant had done, and B.W. told her "he made me take my clothes off and suck his penis." The grandmother then took the victim downtown to the police department and later to a clinic for a medical examination. At the clinic, the victim's vagina and mouth were both examined, which made her feel "uncomfortable." She also spoke to "Pam" at the Child Advocacy Center and gave two separate statements. She acknowledged that she told Pam everything the defendant had done to her only after going to the clinic and being told that she needed to be tested for sexually transmitted diseases. B.W. testified that she does not use tampons during menstruation and that she has never injured her vagina. She denied that anyone else had ever "done these things" to her.

On cross-examination, B.W. stated that in her first interview at the Child Advocacy Center, she told them everything about the bathroom incident except for the defendant having her sit on his lap because she was "kind of embarrassed" and "scared." She also agreed that she stated in her second interview that some "white stuff" came out of the defendant's penis in the bathroom and fell onto the bathroom floor. She clarified that "some of it" went into her mouth, "but not all of it," and that some fell on the floor because he "had his hand on there making it go up and down" and "some of it had came out."

The defendant's ex-wife, Tamara Woodard, testified that she and the defendant married in 1996, after living together for six months, and their relationship ended in 2001. She has four children, including B.W., and she and the defendant have one daughter together, A.Z. The defendant often watched the children after school and when Woodard was working or running errands. She stated that B.W. has never had an injury to her vagina and does not use tampons. On cross-

examination, she testified that she left the defendant because of "his drinking, drugs and abuse towards [her] and [her] kids."

Holly Gallion, a pediatric nurse practitioner with Our Kids Center in Nashville, testified that she examined B.W. on April 13, 2001, for diagnosis and treatment. The victim relayed to her information concerning "penile oral contact" and "penile genital contact" between herself and the defendant. Gallion performed an "anogenital" examination on B.W. and discovered that B.W. had a "tear or an absence of her hymenal tissue at 6:00 o'clock on the hymen" which extended "from the rim to the base of the hymen." This indicated "some sort of past penetrating trauma to that area of the body" and was consistent with "some significant type of penetration, typically from sexual contact." This injury was also consistent with B.W.'s testimony concerning being forced onto the defendant's penis. Although this type of injury could have other, non-sexual causes, such a cause would most likely be "some other almost impaling type of injury to that part of the body." Such an injury to the hymen, though not impossible, would most likely not be caused by falling off a bicycle, using tampons, or masturbation. Gallion testified that the victim and her mother were both "very fearful" and "fearful for their lives" when they came to the clinic.

On cross-examination, Gallion testified that it was impossible to tell how old B.W.'s hymenal injury was, and there was no physical evidence that linked the injury to the defendant. On redirect, she testified that the medical history she obtained from the victim and her mother indicated no possible cause of the hymenal injury other than sexual intercourse with the defendant.

Lisa Dupree, a social worker at the Our Kids Center, interviewed B.W. and her mother to obtain B.W.'s medical history in preparation for Gallion's physical examination. Although not in "acute distress," the victim was "anxious," "nervous," and "reported significant anxiety with having an exam." She was also afraid "that someone was going to kill her." The victim told Dupree that the defendant "made her perform fellatio on him" and that "something came out of his penis and went in her mouth." B.W. "described the substance as white, but sometimes more brown" and said that it had happened "more than one time." After Dupree explained to the victim the need for testing for sexually transmitted diseases, B.W. told her that the defendant's "private touched the part between her legs" on more than one occasion. The victim said something came out of the defendant's penis and "went on her thigh maybe between her legs," and she indicated that the touching was on the outside of her body. However, after the medical examination, Dupree told the victim that they "could see that something had been inside her private." The victim was "quiet and asked if she was in trouble." After she was reassured that she was not in trouble, the victim "said she knew he had put his private inside her, but she was afraid to tell." The victim again stated "she was afraid [the defendant] was going to kill all of them."

Detective David Zoccola of the Metropolitan Nashville Police Department testified that the victim's case was assigned to him after the initial report was taken by a uniform patrol officer. Zoccola contacted the Department of Children's Services ("DCS"), who then arranged for the victim's interview at the Child Advocacy Center and the medical examination at Our Kids Center. Detective Zoccola did not interview the victim but relied on the reports compiled by the other

agencies. He stated that no DNA tests were conducted because of the time lapse between the last sexual encounter and the victim's medical examination. No DNA sample was collected from the defendant for comparison purposes because no DNA sample was collected from the victim. Detective Zoccola acknowledged that the defendant was implicated in the initial report taken by the uniform patrol officer, but when Zoccola referred the matter to DCS, he mistakenly indicated the victim's grandfather was the perpetrator.

Pamela Scretchen, a forensic interviewer at the Nashville Child Advocacy Center, interviewed the victim twice, on March 23, 2001 and May 9, 2001. She took notes from those interviews and later wrote summaries, which she provided to the district attorney's office. Scretchen read aloud extensive portions of those summaries at trial:

I asked [B.W.] if she knew why she was at the center and she said no. I asked [B.W.] what her mother told her about coming to the center and she said nothing really. Just to tell the truth. I clarified to tell the truth about what. [B.W.] replied when my mom's husband child molested me. I asked [B.W.] to tell me what happened from the beginning to the end.

[B.W.] remained silent for several seconds and did not respond. She then blurted he made me get on my knees and suck his -- That was all. [B.W.] appeared upset and did not volunteer any additional details. I clarified, what's your mom's husband's name. [B.W.] stated Harlan Zirker. I showed [B.W.] a male anatomical drawing and asked her to identify the body parts she was referring to and she circled the penis on the male anatomical drawing. When asked what she called that body part, she expressed she didn't want to say the name.

I showed [B.W.] a picture of a female anatomical drawing and asked her to identify the body part that [the defendant], that touched [the defendant's] body. [B.W.] circled the mouth and the breast on the female anatomical drawing. I stated, tell me how that started, from beginning to the end. [B.W.] said it's been since mom first met him. The first time mom went to work and I told mom I needed to go to the dentist. He told me this is what the dentist does and he put his penis in my mouth. [B.W.] reported that her brother and sister were outside and the incident occurred during the daytime.

When asked if she told anyone about [the defendant,] she said, I didn't tell my mother. He told me he would hurt my mother and kill her. [B.W.] added that [the defendant] told her don't tell, if you do, I'm going to hurt you. I clarified this was the first incident when she told her mom that she needed to go to the dentist and she said yes.

[B.W.] reported that she attended Wharton Middle School and lived at 1601 out in North Nashville. When asked when she was in the house, where she was in

the house, she said she didn't remember. When asked if [the defendant's] penis touched on top of her mouth or somewhere else, she stated inside of her mouth.

When asked if something like that happened again, she answered yes. I stated, tell me about that. [B.W.] replied the same thing.

When asked what her stepfather's thing, penis, looked like, she said she didn't know because she closed her eyes. [B.W.] added I did see it once. When asked to describe what she saw, she said it was long. When [I] asked her what [her] stepfather's thing felt like, she said hard. I asked [B.W.] if she ever saw anything come out of her stepfather's thing and [B.W.] said yes, something. I don't know what it was. He said don't swallow it.

[B.W.] continued, one time I spit it out in the trash can and he tried to hit me. [B.W.] continued, he said don't spit that in the trash can. I clarified what did he make you do with the stuff in your mouth. She replied, spit it in the commode. When asked what the stuff in her mouth tasted like, she said salty. When asked if she tasted salty stuff in her mouth one time or more than one time, she answered more than one time.

When asked if something like that happened another time, she reported that the same thing happened when she attended JE Moss Elementary School. [B.W.] explained that she still lived on Barkley when she attended JE Moss Elementary School. I asked [B.W.] when [was] the last time her stepfather did something like that to her. [B.W.] reported that the last time was when her mother went to the hospital to have a baby.

[B.W.] reported that [the defendant] took her and her siblings to see the new baby. [B.W.] reported that she still lived on Barkley. She stated that she lived on Barkley Square Court for about three years. [B.W.] explained that her stepfather was in a rush to get home and reported that he looked at her funny. According to [B.W.], after she visited her mother and the baby, her stepfather drove her back to their home.

[B.W.] stated he called me down stairs in the bathroom and locked the door and he stuck it in my mouth. When asked how that started, [B.W.] explained that her stepfather sat on the toilet and opened his pants. [B.W.] added that her stepfather opened her mouth and put his thing in her mouth. [B.W.] stated that salty stuff came out when he finished. When asked how she was positioned in the bathroom she stated she was on her knees. When asked if she was ever in a different way or position, she stated that she was always on her knees.

[B.W.] reported while she was in the bathroom, her stepfather told her not to tell anyone or he would hurt her. [B.W.] reported that she remembered talking to her

mother over the phone while she was staying overnight at the, in the hospital. [B.W.] expressed that she wanted to tell her mother about her stepfather over the telephone, but was afraid.

After B.W.'s medical examination, Scretchen received a referral for a second interview, in which B.W. spoke about sexual intercourse with the defendant:

> I asked [B.W.] if she knew why she was at the center and she nodded her head yes. [B.W.] expressed that she didn't tell me all the bad stuff that happened to her. [B.W.] questioned if she would have to start over and tell me about what happened a second time. [B.W.] requested that she tell me what she forgot to tell and not talk about everything that she told me in the previous interview.

> I explained to [B.W] the importance of what she had to tell me and that I may have to clarify some things that she told me in the previous interview. I clarified with [B.W.] that during her previous interview she told me that [the defendant] put his thing in her mouth. [B.W.] stated yes.

> I clarified, did that happen one time or more than one time? She replied more than one time. I asked [B.W.] to tell me where the incidents occurred and she listed 1601, out north Nashville, 2208 24th Avenue North, 1466 Snell Boulevard and 516 Barkley Square Court.

> I asked what did you want to tell me about today. [B.W.] answered his thing going in this, and she pointed down toward her vaginal area. I showed [B.W.] a female anatomical drawing and asked her to identify what body part she was referring to on the drawing. [B.W.] circled the vagina and identified it as stuff.

> I showed [B.W.] a male anatomical drawing and asked her to circle the body part she was referring to as thing. And she circled the penis on the drawing. I told [B.W.] to tell me what happened when [the defendant] put his thing in her stuff from the beginning to the end. [B.W.] reported that [the defendant] put his thing in her stuff one time. She reported that she remembered the day being January 20th. When asked what made her know the date is January 20th, she stated because that's when my brother was born.

> According to [B.W.], [the defendant] picked up [B.W.], [A.Z.], her five year old sister and [G.S.], seven year old brother from their grandmother's home. [B.W.] reported that [the defendant] took them to the hospital to visit their mother. [B.W.] explained that they didn't stay at the hospital long because her mother and [the defendant] began to argue. And [the defendant] told them to get ready to leave.

-7-

According to [B.W.], when her siblings, when she and her siblings arrived home, [the defendant] told them that they had to clean up the house. [B.W.] stated that [she] remembered that [the defendant] got mad because she and her brother made a sandwich and there were crumbs on the table. [B.W.] reported that she and her siblings were going up stairs and [the defendant] called [B.W.'s] name from the bathroom.

When asked what time it was when [the defendant] called into the bathroom, said nighttime. The reason she thought it was around 6:00 o'clock. [B.W.] explained, he called me in there and said take off your clothes, and he started unbuckling his belt. According to [B.W.,] [the defendant] made her get on her knees and put his thing, penis, in her mouth.

[B.W.] stated that [the defendant] then put his thing, penis, in her stuff, meaning vagina. [B.W.] explained he would make his thing touch me, he put my leg over his leg and the other leg over. [B.W.] demonstrated using her own legs and arms to represent how she sat on top of [the defendant]. [B.W.] volunteered to draw figures representing how [the defendant] was in the bathroom when he put his penis on her vagina.

[B.W.] drew figures representing [the defendant] under a figure, [B.W.], representing [B.W.]. [B.W.] explained that her back was facing [the defendant]. I asked did [the defendant's] thing go on top of your stuff or somewhere else. [B.W.] answered inside. I asked is there a reason you think [the defendant's] thing was inside your stuff. [B.W.] replied you could feel it, the tip part when he stuffed this in it, it was hurting.

[B.W.] spontaneously pointed to the top part of the penis on the male anatomical drawing. I asked [B.W.] to draw . . . a picture representing what her bathroom looked like. [B.W.] drew objects inside of her bathroom and drew figures representing herself and [the defendant] inside of the bathroom. [B.W.] drew [the defendant] sitting on the toilet and drew a figure representing her in front of him. I asked what did [the defendant] do when his thing was in your stuff. [B.W.] answered, he was moving up and down.

When asked what happened next, she explained white stuff came out and I put my clothes back on. I asked [B.W.] to explain how her clothes were, how her clothes were and she said off. I asked [B.W.] what clothes were off and she spontaneously wrote shirt, underwear and bra. When asked what clothes [the defendant] had off she wrote, took in his pants and underwear half way off.

[B.W.] explained that [the defendant's] underwear were half way down. I asked [B.W.] what happened when [the defendant] stopped, and she said he pushed

me and I fell into the corner. When I looked back, he was going like this. (Indicating) [B.W.] explained by demonstrating by forming her hand into a fist and rapidly moving it up and down. [B.W.] explained that the white stuff came out and went on the bathroom floor. She described it went in the toilet paper and a little got on the rug. He tried to wipe it up, but it wouldn't come up.

The thirty-nine-year-old defendant testified concerning his work history as well as his relationship with Tamara Woodard. He also admitted he had been previously convicted of receiving stolen property and possession of a firearm by a convicted felon. The day after the victim's youngest brother was born, the defendant brought the victim and her other siblings home from the hospital after visiting with their mother. He described the events of the evening:

Well the kids, they came, we all came in and the kids went up stairs. [G.S.], he started playing Nintendo, I went in my bedroom. The kids came in there and asked for a paper and stuff so they can do some drawing, the girls did. So they got paper out of the walk-in closet, Tamara's closet. Then they went in there drawing. They had already eaten earlier so, you know, they cleaned up and went to bed. And that's all of what happened.

The defendant denied both having any type of sexual contact with the victim and that any of the incidents described by the victim in court occurred. After being contacted by the police concerning the accusations, the defendant offered to volunteer for a DNA test, but none was ever administered. On cross-examination, the defendant stated he loved the victim and they had a "stepfather daughter relationship." He stated he could not explain why the victim made the accusations of sexual contact, other than "maybe she's substituting me for someone else." Later, he agreed that his best explanation for the accusations was Tamara Woodard's anger toward him for making her and the children move out of his house, which led her to make the victim allege sexual abuse. He admitted to using marijuana and crack cocaine. On redirect, he acknowledged he had been diagnosed with chlamydia when Woodard and the children moved in with him.

At the conclusion of the State's case, the trial court called upon the State to make an election of offenses. At that time, the State dismissed four of the original counts, and the remaining eight counts were renumbered. The State then detailed to the jury the time, place, and nature of the acts supporting each count of the indictment. Counts 1 and 5 of the renumbered indictment were rape of a child and aggravated sexual battery, respectively, for the first incident which occurred when the victim was in kindergarten and the defendant placed his penis in the victim's mouth and placed her hand on his penis. As to Count 1, the jury returned a verdict of guilt on the lesser-included offense of aggravated sexual battery, and on Count 5 returned a verdict of guilt. Counts 2 and 3, rape of a child, and Counts 6 and 7, aggravated sexual battery, related to the incident that occurred on or about January 20, 2001, when the victim's youngest brother was born, during which the defendant placed his penis in the victim's mouth, penetrated her vaginally, touched her breasts, and had her masturbate him with her hand. The jury returned verdicts of guilt on each count as charged. Count 4, rape of

a child, and Count 8, aggravated sexual battery, stemmed from the incident in the victim's bedroom, and the jury returned not guilty verdicts.[5]

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant's first contention is that there was insufficient evidence to support his convictions. More specifically, he argues the victim's testimony was not credible, as it was "confusing" and "inconsistent," in part because the victim testified that the final incident occurred on January 20, 2000, whereas the State asserted that the incident occurred in 2001.

Where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Rape of a child is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-

---

[5]The record does not contain judgment forms for Counts 4 and 8.

13-522(a) (2003). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body[.]" Id. § 39-13-501(7) (2003). Aggravated sexual battery is the "unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: [t]he victim is less than thirteen (13) years of age." Id. § 39-13-504(a)(4) (2003). "Sexual contact" is defined as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6).

In the present case, the victim recounted three separate occasions in which the defendant committed sexual acts upon her. She described the final incident in the bathroom with the defendant, which occurred around the time her youngest brother was born. Although the victim testified that this occurred in 2000, when her brother was born, the victim's mother stated, as we have said, that the brother was born in 2001, the year the indictment alleged that the final act had occurred. Her testimony was that the defendant placed his penis in her mouth, had her touch his penis with her hand, and touched her breasts. During the same incident, the defendant had the victim sit on his lap and he penetrated her vagina with his penis. Next, she described the first incident, which occurred when she was in kindergarten. She told the defendant her teeth hurt, and he placed his penis in her mouth and moved her head back and forth. In addition, he placed the victim's hand on his penis and made her masturbate him. She further described an incident when the defendant came into her bedroom and placed his penis in her mouth and made her touch his penis with her hand, although the jury acquitted the defendant on the two counts related to that incident.

Further, we note that the results of the victim's medical examination revealed a hymenal tear caused by penetration which was consistent with the account of vaginal penetration of the victim by the defendant. Further corroborating testimony was heard by the jury, including the testimony of Gallion, Dupree, and Scretchen, each of whom recounted what the victim had told them concerning sexual contact between herself and the defendant. We conclude a rational trier of fact presented with the proof in the instant case could have found beyond a reasonable doubt that the defendant was guilty of these offenses. Any issues related to the credibility of the victim's testimony were resolved by the jury in favor of the State and are not subject to review by this court. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Additionally, we must presume that the jury has resolved all conflicts in the testimony in favor of the State. State v. Cabbage, 571 S.W.2d 832, 834 (Tenn. 1978). It is not the prerogative of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. See generally State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995); State v. Boling, 840 S.W.2d 944, 947 (Tenn. Crim. App. 1992).

The defendant also contends that the evidence presented does not support a conviction on Count 1 to the lesser-included offense of aggravated sexual battery, as, in his words, "the testimony of the victim describes Rape of a Child and the jury chose to disbelieve that claim." It is clear in Tennessee that aggravated sexual battery is a lesser-included offense of rape of a child. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Elkins, 83 S.W.3d 706, 713 (Tenn. 2002). The

defendant's "all or nothing" argument, that because the jury rejected the offense of rape of a child in Count 1 he should not be convicted of anything, is similar to those arguments which provided, in part, impetus for our supreme court to adopt the current lesser-included offense analysis in State v. Burns, 6 S.W.3d 453, 466 (Tenn. 1999) (holding that under the old system, juries were forced "into an 'all or nothing' decision that, unfortunately, is likely to be resolved against the defendant, who is clearly guilty of 'something'"). Here, the victim testified that when she was in kindergarten, the defendant placed his penis in her mouth. Obviously, the jury was convinced that, in Count 1, the defendant was guilty of the lesser-included offense, which we have stated is both "a prerogative that the jury has under our system of justice and a right to which an accused is entitled." State v. Hicks, 835 S.W.2d 32, 36 (Tenn. Crim. App. 1992). Accordingly, we conclude that the evidence is sufficient to support the convictions.

## II. Trial Court Error

### A. Defendant's Motion to Strike Two Jurors for Cause

The defendant contends the trial court erred when it denied his motion to strike two jurors for cause. The State responds that the two challenged jurors did not sit on the jury but were excused by the trial court, although not for cause, and thus this issue is without merit.

The purpose of voir dire is to ensure that jurors seated at trial are competent, unbiased, and impartial. See State v. Mann, 959 S.W.2d 503, 533 (Tenn. 1997). The trial court is granted broad discretion to decide the manner in which voir dire will be conducted, and its decisions in this regard will not be disturbed on appeal absent a showing of abuse of discretion. See State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1994). Moreover, unless there has been clear abuse, the trial court's discretion in determining the qualifications of jurors is not subject to review. See Lindsey v. State, 189 Tenn. 355, 366-67, 225 S.W.2d 533, 538 (1949) ("The judges of the various circuit and criminal courts are of necessity given wide discretion in determining the qualification of jurors and their discretion is not subject to review 'except in cases where it is clearly made to appear it has been abused.'") (citation omitted).

In the present case, the defendant moved to strike two jurors for cause. The trial court denied the motion, stating, "No, I'm going to deny both of them. I don't think you established them. I'll excuse them, but not for cause." The defendant did not ask for clarification as to the basis of the trial court's actions, i.e., whether the removal of the two jurors would count against the defendant's peremptory allotment. On appeal, the defendant does not assert either that he exhausted his peremptory challenges or that the jury that heard the case was not fair or impartial. We have previously held that "[i]t is only where a defendant exhausts all of his peremptory challenges and is thereafter forced to accept an incompetent juror can a complaint about the jury selection process have merit." State v. Paul Dennis Reid, Jr., No. M1999-00803-CCA-R3-DD, 2001 WL 584283, at *20 (Tenn. Crim. App. May 31, 2001) (citing State v. Coury, 697 S.W.2d 373, 379 (Tenn. Crim. App. 1985)), aff'd, State v. Reid, 91 S.W.3d 247 (Tenn. 2002). Our holding in State v. Evangeline Combs and Joseph D. Combs, Nos. E2000-02801-CCA-R3-CD, E2000-02800-CCA-R3-CD, 2002 WL

31118329 (Tenn. Crim. App. Sept. 25, 2002), perm. to appeal denied (Tenn. Jan. 27, 2003), resolves this issue in favor of the State:

> The trial court has wide discretion in ruling upon the qualifications of a juror. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). When the trial court erroneously refuses to excuse a juror for cause, the error is harmless unless the jury that heard the case was not fair and impartial. State v. Thompson, 768 S.W.2d 239, 246 (Tenn. 1989). It is well-settled that a defendant who disagrees with a trial court's ruling on juror challenges "for cause" must, in order to preserve the claim that the ruling deprived him of a fair trial, first utilize such peremptory challenges as he has available to remove the jurors. State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993). The trial court's failure to properly exclude a juror for cause is grounds for reversal only if the defendant has exhausted all of his peremptory challenges and an incompetent juror is then forced upon him. Ross [v. Oklahoma], 487 U.S. [81,] 89, 108 S.Ct. [2273,] 2279 [(1988)]; State v. Jones, 789 S.W.2d 545, 549 (Tenn. 1990).

Id. at *36. The two jurors of whom the defendant complains did not sit on his jury. Neither has the defendant asserted that he was forced to utilize all of his peremptory challenges to excuse the jurors, thereby being forced to accept an incompetent one in their stead. Finally, the defendant has not asserted that the jury that actually heard the case was not fair and impartial. This issue is without merit.

## B. Prior Criminal Convictions

The defendant filed a motion in limine to exclude evidence of his prior convictions for possession of a firearm by a convicted felon and receiving stolen property, arguing the prejudicial effect of the convictions "clearly outweigh[s] the probative value of such convictions as to the defendant's voracity [sic]" and therefore should not be allowed for impeachment purposes.

Impeachment by a prior conviction is governed by Tennessee Rule of Evidence 609(a), which provides as follows:

Impeachment by evidence of conviction of crime.

(a) General Rule.--For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:

(1) The witness must be asked about the conviction on cross-examination. If the witness denies having been convicted, the conviction may be established by public record. If the witness denies being the person named in the public record, identity may be established by other evidence.

-13-

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Tenn. R. Evid. 609(a).

Two factors should be considered when deciding whether the probative value of a prior conviction outweighs its unfair prejudicial effect on the substantive issues of a case. State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999). First, "[a] trial court should . . . analyze the relevance the impeaching conviction has to the issue of credibility." Id. (citing Neil P. Cohen et al., Tennessee Law of Evidence § 609.9 at 376 (3d ed. 1995)). Second, if the trial court finds that the prior conviction is probative of the defendant's credibility, then the court should "'assess the similarity between the crime on trial and the crime underlying the impeaching conviction.'" Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9 at 376 (3d ed. 1995)). The second criterion is particularly important because in cases where "an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger that jurors will erroneously utilize the impeaching conviction as propensity evidence of guilt and conclude that since the defendant committed a similar offense, he or she is probably guilty of the offense charged." Id. (citing State v. Barnard, 899 S.W.2d 617, 622 (Tenn. Crim. App. 1994); State v. Farmer, 841 S.W.2d 837, 839-40 (Tenn. Crim. App. 1992); Long v. State, 607 S.W.2d 482, 486 (Tenn. Crim. App. 1980)). The more similar the impeaching conviction is to the trial offense, the greater the risk of a prejudicial effect to the defendant. Id.

In addition to evaluating the probative value versus the unfair prejudicial effect, a trial court should make findings on the record when deciding whether to admit a prior conviction for the purposes of impeachment:

Tennessee case authority strongly urges judges to explicitly state, on the record, their reasons for allowing or disallowing a criminal conviction to be used for impeachment under Rule 609. The trial court should carefully explain any balancing of factors. Without this record, it will be difficult for appellate courts to determine whether the balancing test was properly applied.

Neil P. Cohen et al., Tennessee Law of Evidence § 6.09[14][b] (4th ed. 2000) (footnotes omitted). The trial court's decision to admit prior convictions for impeachment purposes will not be reversed on appeal unless it appears from the record that the trial court abused its discretion. State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

During the pretrial hearing, the court heard arguments as to the admissibility of the defendant's prior convictions for impeachment purposes:

[DEFENSE COUNSEL]: . . . I would direct the Court's attention to the motion in limine regarding the use of my client's prior convictions for impeachment purposes and my move or my motion to eliminate that evidence pursuant to Rule 609 of the Rules of Evidence.

My client has several convictions, I believe four. Of particular concern, are the two convictions for aggravated sexual battery. Incidently [sic] 6 of the 12 counts of the indictment that we are here on trial for today are for aggravated sexual battery. I think it is clear that under the Rules the probative value of those convictions as it relates to my client's veracity is clearly outweighed by the risk of unfair prejudice. And so I would ask the Court for a ruling to direct the District Attorney not to ask about those convictions.

[THE STATE]: Your Honor, the State will concede that.

THE COURT: All right. That does that.

[THE STATE]: The State would submit that it is proper, that if the defendant testifies that we be permitted to question him about other felony convictions. One is the possession of a weapon by a convicted felon. The other is a possession or concealment of stolen property. But those are not related to this type of offense, and so there is no risk of unfair prejudice.

[DEFENSE COUNSEL]: Judge, my response to that would be that I think clearly the conviction for concealing stolen property, I think it's receiving stolen property. To be candid with the Court, I think that does go to veracity, and so I'm not going to object to that.

However, the possession of a weapon I don't think that goes directly to veracity, and certainly I think the prejudicial value of it would outweigh any probative value it would have with respect to my client's truthfulness.

THE COURT: What is the date of the weapon's [sic] conviction?

[THE STATE]: Your Honor, I have a copy of the judgment. It is June the 29th of the year 2000.

THE COURT: Well at this point in time, I don't think there is any way that the Court could tell with regard to this matter, because I don't know what the testimony is. I'll have to wait and see what the testimony is with regard to this matter. And at the proper time before the State attempts to ask any questions, I would have to know. I would say preliminarily though, I think the State would have the right to ask it.

[DEFENSE COUNSEL]: Judge, there is one more motion.

The trial court took no further action on the motion and made no findings on the record concerning the probative or prejudicial value of the prior firearm conviction. The only mention of the conviction at trial was when defense counsel asked the defendant on direct examination if he had been convicted of receiving stolen property and possession of a firearm by a convicted felon, to which the defendant responded affirmatively. The State did not ask about the convictions on cross-examination.

On appeal, the defendant argues that the trial court erred when it "failed to rule on the Motion and defense counsel was forced to inquire as to the conviction as a matter of strategy lest the prosecution be able to bring it out on cross-examination."

Although prior to his testimony, the defendant was on notice that the court was of the opinion, "preliminarily," that evidence of the conviction was admissible for impeachment purposes, it was apparent that the trial court had not made a final ruling on this issue. However, without asking that the court do so, the defendant was asked about this conviction during his direct examination. Most importantly, even if we were to conclude the court erred in not ruling on the motion or in admitting the conviction, we conclude the error was harmless. We note especially the lack of similarity to the offenses charged. Considered in light of the entire proceedings and the proof presented at trial concerning the multiple sexual acts committed by the defendant upon the victim, it is not reasonable to suppose that this brief reference to a prior weapon conviction had any impact on the jury's verdicts. See Tenn. R. Crim. P. 52(a); see also Tenn. R. App. P. 36(b).

### III. Sentencing

As to sentencing, the defendant contends the trial court erred in ordering consecutive sentences. Additionally, the defendant asks us to review the trial court's application of enhancement factors, as well as the consecutive sentences, in light of Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004).

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d)

(2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S .W.2d at 169.

The only testimony at the sentencing hearing was from the defendant, who indicated he wanted to "address the Court":

Well, I just wanted, I know this is the time where I supposed to maybe ask for leniency and things of that nature. I won't do that. But I will ask that the Court take into consideration the miss, the persecutory [sic] misconduct which carried on in the courtroom by witness tampering, when the prosecution during recess engaged in a lengthy conversation after examination with [B.W.] before the defense had the opportunity to cross examine her. And I think if the Court, which I'm sure the Court was not aware of this was going on, but you and I and Ms., the prosecutor is aware of. I want to bring this and make sure it be [sic] on record, so.

At the conclusion of the sentencing hearing, the parties agreed that the defendant was a Range II, multiple offender. The trial court applied the following enhancement factors to Counts 2, 3, 6, and 7: (2), the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (14), the felony was committed while on any of the following forms of release status if such release is from a prior felony conviction: probation; and (16), the defendant abused a position of public or private trust. See Tenn. Code Ann. § 40-35-114(2), (14)(C), (16) (2003). On Counts 1 and 5, Class B felonies, the court applied no enhancement factors and sentenced the defendant to twelve years, the minimum within the range.

On Counts 2 and 3, Class A felonies, the court began at the midpoint in the range and enhanced both sentences to thirty-six years. On Counts 6 and 7, Class B felonies, the court began at the bottom of the range and enhanced both sentences to fifteen years. The trial court ordered Counts 2 and 3 to be served consecutively and all other counts to be served concurrently.

The defendant initially asserts on appeal that the trial court erred in imposing consecutive sentences on Counts 2 and 3, rape of a child. We disagree.

In ordering consecutive sentencing, the trial court stated, "I don't know when [the defendant] would not be a threat to the community," and then agreed with the State that two of the criteria listed in Tennessee Code Annotated section 40-35-115(b) applied:

(2) The defendant is an offender whose record of criminal activity is extensive;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and the victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

Tenn. Code Ann. § 40-35-115(b)(2), (5) (2003).

As to criterion (2), the defendant's presentence report indicates he has the following convictions in Tennessee: criminal trespassing, possession of drugs, child neglect, two counts of aggravated child abuse in 1998, and two counts of aggravated sexual battery in 1988. Further, the defendant pled guilty in 2000 to receiving stolen property and possession of a firearm by a convicted felon in Kentucky. Additionally, as to criterion (5), the defendant was convicted of six statutory offenses arising from two separate occurrences with his stepdaughter, a minor. These undetected sexual encounters occurred over a span of five years between the time the victim was in kindergarten until she was in fifth grade. According to the victim's testimony and her statements to other witnesses, she said that the abuse included vaginal intercourse, fondling of her breasts, oral sex, and masturbation of the defendant. The vaginal intercourse made the victim's vagina and stomach hurt and made her feel "kind of sick." Additionally, the victim was afraid to tell anyone because the defendant threatened to hurt or kill her or her mother, and she was still undergoing therapy at the time of sentencing. The record fully supports the trial court's determination as to the imposition of consecutive sentencing.

In a supplemental brief, the defendant also asks us to review the application of enhancement factors as well as the imposition of consecutive sentencing in light of the recent landmark United States Supreme Court decision in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004). However, subsequent to the briefs being filed in this matter, our supreme court determined that Blakely is not applicable to Tennessee's sentencing procedures. See State v. Gomez, __ S.W.3d __,

slip op. at 27 (Tenn. 2005) ("Tennessee's sentencing structure does not violate the Sixth Amendment.").

Accordingly, we conclude the <u>Blakely</u> decision does not affect the length or manner of service of the defendant's sentences, which, we conclude, are supported by the record.

## **<u>CONCLUSION</u>**

Based upon the foregoing authorities and reasoning, we affirm the defendant's convictions and sentences.

_____
ALAN E. GLENN, JUDGE
