## LINDSEY *v.* STATE.

*(Knoxville,* September Term, 1949.)

Opinion filed December 10, 1949.

356

FRANK N. BRATTON, of Madisonville, for plaintiff in error.

J. MALCOLM SHULL, Asst. Atty. General, for the State.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error has appealed from a conviction of murder in the second degree. The assignments of error are, (1 and 2), that the evidence preponderates in favor of appellant's innocence and against the verdict of the jury, (3) that the uncontroverted evidence shows "that the defendant shot the deceased in his own necessary self-defense", (4) that a new trial should have been granted because one of the jurors "did not hear all of the statements of testimony of the defendant, Reed Lindsey, while testifying in the case in his own defense" and especially as to facts detailed by defendant relating to the actual firing of the pistol, etc. Appellant insists, as shown by affidavits of himself and his counsel, that the extent of the juror's deafness was unknown to either of them until several days after the conclusion of the trial.

The plaintiff in error, who will be later referred to as the defendant, shot and killed one Herman Shirk on November 14, 1948, in Monroe County. The only question of fact is whether or not the killing was in his own necessary self-defense. There is little if any dispute as to events which transpired throughout the day and up to the time of the homicide.

On Sunday morning, November 14th, the defendant drove his truck, which was more or less of a "rattle-

trap'', to the home of the deceased. He had but little gasoline in the tank and deceased suggested that it be replenished from his own vehicle, which was done. The two men started out supposedly to visit a relative of the deceased. Each one had a pint of whisky which was readily consumed. Later in the day the deceased bought another pint of whisky. They visited a filling station on two occasions for the purpose of repairing the truck, and possibly to buy some gasoline. At one time some officers were in the act of arresting the deceased when the proprietor of the gas station suggested that he was causing no disturbance. No arrest was made. The two men drove to Loudon, and it is shown by the proof that deceased was, to use the defendant's expression, ''pretty well drunk''. After leaving Loudon the truck, which at that time was being driven by the deceased, ran into a ditch. After they got out of the ditch the defendant appears to have taken over the duty of driving. The homicide occurred soon thereafter and after dark near the home of William Ward. He saw the truck go by his house about dark, the defendant being at the steering wheel and the deceased on his right. Ward was standing on his front porch when the truck passed. After it had passed he heard a noise, which sounded as if he stripped a gear and they stopped. He went back in the house and very shortly thereafter heard shooting; he testified that the shooting ''stopped for a thought and commenced again''. He heard the truck being driven away and at the same time a car passed going in the opposite direction. This car was being driven by R. S. Howard. He testified that the lights on the car revealed the body of deceased lying in the road with his hat partly on his head. He had been shot seven times with .32 caliber slugs. One bullet en-

tered the right side of the face and came out on the left side; one went through the roof of the mouth; one entered the right side of the body and came out on the left side; four slugs entered the back, three of them straight across the back about the level of the belt and the other below the left shoulder blade. There were no powder burns upon his clothes or any part of his body. There appears to have been no signs of any struggle between the men.

The defendant's brother took him to the sheriff, who placed him in jail. An officer asked him if he wanted to make a statement. But he declined with the remark that he would wait and let his lawyer speak for him. The defendant pleaded self-defense. He testified that he was 21 years of age and weighed about 125 pounds at the time of the killing. The deceased was 36 years old and weighed 180 pounds; that shortly after passing Ward's home a wire came off of a spark plug and after he repaired it there were no lights on the truck; that deceased insisted upon driving but that he, defendant, refused because "he was too drunk". The defendant gave the following account of the killing:

"Hump said to let him drive; I told him he was too drunk to drive, he would wreck us. I said, 'You are liable to run it in the ditch; there is no top and it is liable to turn over on us.' That made him mad; he grabbed me by the throat with both hands, and was choking me."

. . . . . .

"Q How long did you say he chocked you there before you shot him? A Something like two or three minutes.

"Q You were afraid of him? A I guess I was.

"Q You guess you were? A I know I was.

"Q Why did you shoot him? A I thought he was going to kill me; he said he would, and I knew he would do it.

"Q Do you remember when he fell after you shot him? A No; after I got to shooting I saw him fall—saw the form of his body laying there.

"Q Then what did you do? A I got in my car and started it; backed up and went around the left hand side of him and went home; saw my brother, Carl, there; I ask him to take me to town; I didn't believe I could make it.

"Q He brought you to jail? A Yes.

"Q Did you make a statement to the jailer that you would tell him about it the next morning? A Yes sir, I told him I wanted to let my lawyer tell me what to do." On cross-examination he claimed not to know the man from whom he purchased the pint of whisky. When asked "Why did you have a pistol in your pocket", replied "I was going to sell it". He could not name the person who was to buy it; nor could he give any reason for leading it, saying "I just put them in there". He gave the following testimony on further cross-examination:

"Q How did you hold the pistol? A I don't know exactly how I was holding it.

"Q Had to have it against him? A I don't know exactly.

"Q Shot him in the side of the head and in the mouth—how could you shoot him in the mouth? A I didn't know if I was hitting him or not.

"Q You shooting with your right hand? A Yes, sir.

"Q How did you shoot him in the right side of the head—if he was holding you with his left hand—you were standing there fronting each other? He had you with

his left hand and you came around with the pistol and shot him on the right side of the head? A I don't know what position he was in.

"Q You say he had hold of you choking you with his left? A Yes, sir.

"Q How could you shoot him straight in the back? A He was choking me so much I couldn't hardly tell what was going on. He turned me loose after I shot."

. . . . . .

"Q If you were facing each other and he had you by the throat with his left hand how could you shoot him in the right side of the head—you had the gun in your right hand—explain that if you can. You say he was out in front, had you with his left hand by the throat and you shot him with your right hand, how did you shoot under his shoulder? A I don't know if I shot him while he was holding me.

"Q You swore he had you by the throat—you fired 7 shots and he turned you loose? A I don't know when he turned me loose."

It appears from further questions and answers that the shooting took place in front of the truck and that the defendant had to back his truck and drive around the body. No answer was given as to why he left the deceased lying in the road other than to say "he was going to give himself up".

 There were no eyewitnesses to the homicide. We think the jury was warranted in not accrediting the defendant's statement of facts tending to show that the homicide was justifiable. The following undisputed and unexplained facts wholly discredit him; (1) his flight from the scene leaving the body in the road exposed to the danger of automobile traffic, (2) his failure to report

the killing to William Ward who heard the shots fired, (3) lack of powder burns on the clothing or body, (4) the location of the wounds upon the body of the deceased. The defendant could not have shot deceased in the mouth without leaving powder burns on the face; he could not have shot him in the right side and on the back while deceased was choking him with his left hand. Moreover if the deceased was too drunk to drive the truck, and evidently he was very drunk, he was in no condition to cause the defendant to fear either death or great bodily harm. The first three assignments of error are overruled. Coming now to the last assignment in which contention is made that one of the jurors did not hear all the evidence, and especially that part of the defendant's testimony in which he described the action of the deceased in choking the defendant and the latter's use of the pistol, we have given full consideration to every argument in support of this assignment and hold that it is without merit.

The record discloses without question that the trial judge was apprised of the juror's deafness, and satisfied himself that he was not disqualified on that account. Counsel for the defendant also knew that the juror was deaf to some extent and failed to challenge him for cause or peremptorily.

There is no question but that under the constitution of Tennessee the defendant was entitled to a jury of twelve good and lawful citizens, selected in the presence of the trial judge and fully qualified to decide the issues involved. *Woods* v. *State,* 130 Tenn. 100, 106, 169 S. W. 558, L.R.A. 1915F, 531. Contention is made that "the plaintiff in error was only tried by eleven jurors", all of which is based upon the juror's affidavit that he did not

hear all of defendant's testimony, especially as to the actual shooting. We are quite unable to reconcile the testimony of the juror that he heard substantially all the evidence, but did not hear that part of the defendant's statement in which he described the physical encounter between the two men.

The ruling which we are called upon to make in response to this assignment is whether or not the objection to the juror's qualification was of the "propter defectum" class, and should have been made before the verdict. In *Durham* v. *State,* 182 Tenn. 577, 581, 188 S. W. 2d 555, 557, 160 A.L.R. 746, we dealt with this question in which it was said: "Objections based on general disqualifications, such as age, residence, relationship, feeble mindedness and the like are of the *propter defectum* class, to which the rule applies that the challenge shall be made before verdict." Citing cases. We think the rule applies in the case now before us, and that the juror's alleged disqualification falls within the *propter defectum* class. The objection should have been made before verdict, otherwise it is waived. It is true the defendant was entitled to a trial by a jury such as the constitution contemplates. But where the alleged disqualification, if in truth the extent of his deafness disqualified him, was known to the counsel and the court before verdict, the objection comes too late after verdict. The trial judge has a wide discretion in ruling upon the qualification of jurors and where the record shows, as it does in the instant case, that he was apprised of the juror's deafness before trial and investigated the extent of it, the said juror will not be heard to impeach the verdict by setting up his disqualification after the verdict. For us to hold that the objection does not fall within the *propter defec-*

*tum* class would result in permitting a defendant to gamble on the verdict. The rule is not so uncertain that a defendant will be permitted to accept a juror who is known to be ''hard of hearing'' and then rely on it as a ground for a new trial when the verdict goes against him. Our reason for holding that the objection to the juror, because of partial deafness, comes too late is not in conflict with our own case of *Durham* v. *State, supra,* upon which the plaintiff in error relies. Other cases, also relied on in the brief of counsel for a reversal, are not in contradiction of the general rule that unless challenge is made upon the *voir dire* examination of the juror it comes too late on motion for a new trial, unless actual prejudice or bias is shown, or where the answers of the juror were such as to disarm any suspicion of his disqualification.

In *Monday* v. *State,* 160 Tenn. 258, 265, 238 S. W. 2d 656, 657, the Court in discussing the question of waiver of a juror's qualifications, said: ''It appears to be well settled that a failure to challenge or object operates as a conclusive waiver if the ground of objection is known to the party at the time the jury is impaneled, or might have been discovered by the exercise of ordinary diligence. 35 C. J., Section 404½, p. 364.''

We have given consideration to cases from other jurisdictions and find that the weight of authority supports the State's contention that the defendant waived any objection to the juror's qualification by his failure to make seasonable objection when his partial deafness was brought to the attention of counsel prior to being sworn. It is well settled by all the authorities that the defendant must exercise diligence to ascertain the qualifications of jurors. If he knows of the juror's partial deafness he

will not be permitted to accept him and thus speculate upon the outcome of his case. See *Monday* v. *State, supra,* wherein the Court cited with approval the following sound rule of procedure:

" 'It would be no less intolerable than impracticable if after every trial there could be an investigation into matters affecting the qualification of jurors which are readily ascertainable in advance. Such a procedure would place a premium upon the neglect to ascertain whether a juror is qualified; for few men would challenge a juror if by their failure to do so they could gain a chance for a new trial in case of defeat.' *In re Chelsea Water Works Company,* 10 Exch., 731, 156 Reprint, 635." To the same effect see *Cooper* v. *State,* 27 Okl. Cr. 278, 226 P. 1066.

In *Durham* v. *State, supra,* the record showed without doubt that the juror, who was challenged after the verdict, was the prosecutor in a criminal case pending and involving a similar crime. He was examined at length on his *voir dire* as to his "experience in court", and answered he had none, all of which he knew to be false. The defendant had no knowledge of it while the State was presumed to know about it. It was held that there was no waiver of his disqualification and the trial judge committed prejudicial error in not granting a new trial. The cases there cited as authority support the general rule, to which we have made reference, that the disqualification was not of the *propter defectum* class, but *propter affectum* (on account of partiality) from some bias or prejudice existing or presumed to exist from circumstances.

Now in the instant case there was no bias or prejudice on the part of the juror. No question was asked him on

his *voir dire*. In *Higgins* v. *Commonwealth*, 287 Ky. 767, 155 S. W. 2d 209, 212, relied on by plaintiff in error a new trial was sought upon an affidavit of a juror to the effect that he "did not hear unless the words used are extremely loud and he was unaware of all the testimony given at the trial". The Supreme Court of Kentucky in ruling upon his disqualification held "that had he upon his *voir dire* examination been challenged for cause therefor, but without discovery of his disqualification, the same would have to be sustained." The foregoing is apparently in accord with the rule announced in the Durham case. But it does not support the defendant's contention that the disqualification of the juror could be challenged after the verdict.

In *Thomas* v. *State*, 109 Tenn. 684, 75 S. W. 1025, 1026, it was held that the action of the trial judge in ruling upon the qualification of jurors is "entitled to the weight of a verdict of a jury". It was further said: "The presumption is in favor of the qualification of the jurors and of the regularity of trials, and this presumption must be overcome by clear and competent evidence before a motion for a new trial will be allowed for these reasons."

In *Lee* v. *State*, 121 Tenn. 521, 553, 116 S. W. 881, 890, four jurors filed an affidavit, the effect of which was to impeach their verdict. In ruling adversely to appellant's contention the Court approved the following excerpt from *Harvey* v. *Jones*, 22 Tenn. 157, 159: "This court has repeatedly had occasion to comment upon the danger of setting aside verdicts upon the affidavits of jurors, and to declare *that it will be done only in extraordinary cases, and then with great caution.*" (Italics ours.)

█ The judges of the various circuit and criminal courts are of necessity given wide discretion in determining the qualification of jurors and their discretion

is not subject to review "except in cases where it is clearly made to appear it has been abused." *Thomas* v. *State, supra.* The trial judge gave careful consideration to the juror's alleged inability to hear; he was given a seat in the jury box nearest the witness chair and no complaint was made during the trial that he could not hear any of the testimony. It also appears from the record that the trial judge from time to time, and on his own motion, cautioned the defendant to speak out loud so that everyone could hear. Thus, in the light of these facts, it cannot be said that the court abused his discretion in impaneling the jury to try the case.

All assignments of error are overruled and the judgment of the trial court is affirmed.

All concur.