# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
### Assigned on Briefs November 20, 2008

## STATE OF TENNESSEE v. JAIRO JESUS CANALES GARCIA

**Direct Appeal from the Circuit Court for Marshall County**
**No. 17262     Robert Crigler, Judge**

---

**No. M2007-01673-CCA-R3-CD - Filed November 18, 2009**

---

The defendant, Jairo Jesus Canales Garcia, was convicted of first degree (premeditated) murder; first degree (felony) murder, burglary, a Class D felony; attempted especially aggravated robbery, a Class B felony; and theft of property, a Class D felony. He received an effective sentence of life plus twenty years. On appeal, he argues that: the evidence was insufficient to support his convictions; the jury was selected improperly; and the trial court erred in allowing certain testimony. After careful review, we affirm the judgments from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Hershell Koger, Pulaski, Tennessee, for the appellant, Jairo Jesus Canales Garcia.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Charles Frank Crawford, Jr., District Attorney General; and Ann L. Filer and Michael D. Randles, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case involves a murder in Lewisburg. The victim, Wing Chiu Li, the father of the owner of a restaurant which was being renovated, was working on the renovations when he was confronted by the defendant and another man. The victim was later found lying in a pool of blood with his wallet empty beside him. The victim suffered fatal wounds to his neck and also suffered wounds to his hands and wrists, which the autopsy revealed were characteristic of defensive wounds. The fatal wounds to his neck included nine separate stab wounds on the right side and a four-inch-deep wound on the left side.

The victim's son, De Qun Li, testified at trial that he relocated to the United States from China in 1993 and moved to Tennessee in 1994. De Qun Li testified that he opened the Peking

Buffet restaurant in 2001. He decided to open a second restaurant in Lewisburg, but the new restaurant needed remodeling before it could open. He testified that his father, the victim, was helping with the renovation.

On June 26, 2006, De Qun Li went to Nashville airport to pick up his sister-in-law. He said that he left Lewisburg around noon, spoke to his father on the telephone around one o'clock, and returned to Lewisburg around seven o'clock that evening. He drove to the new restaurant, he saw that the door was open but the victim's minivan was gone. He took his sister-in-law home and returned to the restaurant to find his father dead in a pool of blood.

The victim's son testified that he had employed Daniel Vasquez, the co-defendant, as a dishwasher at the restaurant. He said that Vasquez was paid in cash once a month. He testified that Vasquez was not a good dishwasher and would leave work without permission. Vasquez was later hired to help with the remodeling of the new restaurant.

Dr. Thomas Deering, the assistant medical examiner, testified that he performed the autopsy on the victim. He testified that the victim sustained defensive knife wounds on his hands and wrists, in addition to scrapes and bruises on the back of his elbows. Dr. Deering opined that the wounds were characteristic of injuries sustained by someone fighting to avoid more serious injuries. The victim suffered nine stab wounds on the right side of his neck and a four-inch-deep wound on the left side of his neck. The wounds to his neck were fatal. He further opined that the wound to the left side of his neck was received while the victim was face down.

The victim's daughter-in-law testified that she hired the defendant's father as a dishwasher at the Peking Buffet on April 5, 2006. The defendant's father introduced the defendant to the victim's son.

Billy Duckworth of the Lewisburg Police Department testified that he saw two Hispanic males sitting near Rock Crusher Road on the day of the murder. He picked the defendant out of a photographic line-up as one of the men he saw that day. After the victim's death, Officer Duckworth returned to the area where he saw the men, discovered several footprints, and photographed the footprints.

Pamela Rodgers testified that she knew both the defendant and co-defendant Vasquez. She played basketball with the defendant and often saw him with Vasquez. She also saw the two men sitting under the tree on Rock Crusher Road on the day of the murder. She testified that the defendant did not look happy, so one of her daughters went to talk to him. She picked up her daughter after completing some errands. When she asked the defendant what was wrong, he did not say anything. The defendant told her that he would be leaving town and would not see Rodgers again.

Cori Rodgers, the thirteen-year-old daughter of Pamela Rodgers, testified that she saw the defendant and co-defendant Vasquez sitting under the tree. She thought that the defendant looked

sad, so she went to talk to him. She asked him if he needed a ride, and he told her someone was going to pick him up. She said that co-defendant Vasquez had a knife that he was opening and closing. The defendant told her that he was leaving to live with his mother.

Special Agent Wayne Wesson, an investigator with the Tennessee Bureau of Investigation (TBI), testified that the defendant and co-defendant Vasquez were prime suspects in the case. On July 7, 2006, he learned that the two men were located in Minnesota, and, the following day, he and several other officers went to Minnesota.

The terminal manager for Greyhound Bus Lines in Nashville testified that two adult tickets for Norcross, Georgia, were purchased in the name of Jairo Canales on June 26, 2006 at 7:36 p.m. Central Standard Time. The defendant and co-defendant changed their clothes after they bought the tickets but before they boarded the bus.

Officer Anthony Holton testified that he is a police officer in St. Paul, Minnesota. On July 7, 2006, he and his partner, Ron Townsend, came into contact with Daniel Calvo Vasquez and Jairo Jesus Canales Garcia. After running a routine warrants check, they discovered that co-defendant Vasquez had an outstanding aggravated assault warrant out of Tennessee. After contacting Agent Wesson, they arrested the defendant.

Special Agent Linda Littlejohn testified that footprints from the crime scene were similar to ones on the ground where the defendant was seen prior to the murder. The TBI latent prints examiner testified that bloody prints of the defendant's left ring and index finger were found on a section of a door that was removed from the victim's restaurant. A TBI forensic scientist and expert in DNA/serology testified that he collected a blood stain from the passenger-side seatbelt of the victim's van. The victim's blood and DNA were found on the headrest of the driver's seat and on the seatbelt from the driver's side of the van. The victim's blood was also found on the passenger-side headrest, seatbelt latch, the seat adjustment, the door handle, and the seatbelt.

TBI Special Agent George Barturen, who speaks both English and Spanish, testified that he was asked by Agent Wesson to assist in an investigation because the possible suspects spoke Spanish. He traveled to St. Paul, Minnesota to speak with the suspects. When he arrived, he conducted interviews with co-defendant Vasquez and the defendant. On the next day, he conducted a more extensive interview with the defendant. The interview was recorded in Spanish, and when he returned to Tennessee, he prepared a transcript of the conversation between himself, the defendant, and Agent Wesson. He then translated the Spanish conversation into English. The defendant told Agent Barturen that he did nothing to the victim and that the problem was between co-defendant Vasquez and the victim. Co-defendant Vasquez worked for the victim at the restaurant and was fired without being paid. Because co-defendant Vasquez wanted to collect his money from the victim's son, the defendant waited for him to appear that day.

The defendant told Agent Barturen that they entered the restaurant and that the victim said he was going to call the police. He said that they began to argue, and the victim attempted to hit

Vasquez with a caulk gun. The defendant took the caulk gun from the victim. The door to the construction area was open, and Vasquez told the defendant to close it. After he shut the door, the victim and Vasquez struggled on the floor, and Vasquez then ran from the building. The defendant said he saw blood coming from the victim, who was lying face down on the floor. Vasquez ran from the restaurant and drove away in the victim's van.

The defendant acknowledged that he had a gun in his possession when the struggle occurred and that he threw the gun in a river on the way to Nashville. The gun was never located. The defendant claimed that he did not have any blood on him. The defendant changed his story after Agent Wesson told him that the door he closed had blood on it. He then said that Vasquez bit the victim on his hands and that the victim might have bled on the caulk gun before he took it. He told the agents that they took the victim's van to Nashville and left it parked on the street. They then took a cab to the bus station and took the bus from Nashville to Georgia.

At trial, the defendant testified that he met co-defendant Vasquez two months before the murder. He said that he went with Vasquez to the restaurant so Vasquez could get paid. They waited under the tree on Rock Crusher Road because it was hot outside. Vasquez told him they needed to wait until the restaurant owner arrived. They saw the victim's van arrive, and they went inside the restaurant. He said that the victim was the only person inside. Vasquez and the victim talked and got into an argument that led to a fight. The defendant said that the victim picked up a caulk gun when the men separated. The defendant took the caulk gun from the victim, and the two men continued to fight.

The defendant said that Vasquez told him to close the door. When he returned, he saw the victim on the floor and saw Vasquez run away. The defendant saw blood spreading on the floor but did not realize that the victim had been stabbed. The defendant and Vasquez left the restaurant and drove to Nashville.

The defendant said that Vasquez had blood on him and that he poured bottles of water on Vasquez to remove the blood. He maintained that the only aid he provided was in taking the caulk gun from the victim. The defendant said he did not see any blood before he closed the door and could not explain how his fingerprints at the scene were made in the victim's blood.

The defendant was convicted of first degree (premeditated) murder, first degree (felony) murder, burglary, attempted especially aggravated robbery, and theft of property. His murder convictions were merged, and he was sentenced to life plus twenty years. He was sentenced to life for the murder conviction. He was sentenced to twenty years for the Class B felony conviction, which was to be served consecutively to the life sentence. He was further sentenced to four years for the burglary and theft convictions, to be served concurrently with the life sentence.

Analysis

On appeal, the defendant contends that the evidence was insufficient to support his convictions. Specifically, he contends that the evidence against him was circumstantial and that he was not a party to the crimes. When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Brewer*, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. *Id.* In *State v. Grace*, the Tennessee Supreme Court stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *Grace*, 493 S.W.2d at 476.

Where a defendant challenges the sufficiency of the evidence to support a conviction, the question on appeal is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have determined that the essential elements of the crime were established beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2786, 2789 (1979); Tenn. R. App. P. 13(e).

The defendant argues that he provided proof that he was not a party to the crimes because the disagreement over money was between the victim and the co-defendant and because the co-defendant was seen with a knife prior to the murder. However, in the light most favorable to the State, the proof at trial demonstrated that the defendant was involved in the murder of the victim. The evidence at trial demonstrated that the defendant waited on the victim's son with the co-defendant. The defendant acknowledged that he disarmed the victim by taking the caulking gun from him. The testimony from the medical examiner reflected that the victim was beaten and killed because of the presence of bruising and defensive wounds. There was evidence collected at the crime scene that the defendant's fingerprints at the crime scene were made in the victim's blood,

contrary to his story that he did not touch the defendant. Further, the presence of blood on both the driver's and passenger's sides of the van is evidence that the defendant played more of a role in the slaying than he testified. Even assuming the defendant did not touch the victim, he did close the door to the restaurant so that no one outside the building could see or hear what was occurring inside. Further, the defendant escaped from the crime scene in the victim's stolen automobile. When viewed in the light most favorable to the prosecution, it is reasonable that any rational trier of fact could have determined that the essential elements of the crime were established beyond a reasonable doubt. The defendant is not entitled to relief on this issue.

Next, the defendant argues that the trial court either improperly excluded or refused to exclude members of the jury prior to trial. The defendant contends that the trial court erred in denying his challenges for cause as to six specifically named jurors. Rule 24(c) of the Tennessee Rules of Criminal Procedure governs challenges to potential jurors for cause and, in pertinent part, states that "[a]ny party may challenge a prospective juror for cause if . . . there exists any ground for challenge for cause provided by law; [or] the prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror." However, a trial court has wide discretion in ruling on the qualification of jurors. *State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). The ultimate goal of voir dire is to ensure that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire rests within the sound discretion of the trial court. *State v. Howell*, 868 S.W. 2d 238, 247 (Tenn. 1993). The trial court is granted broad discretion to decide the manner in which voir dire will be conducted, and its decisions in this regard will not be disturbed on appeal absent a showing of abuse of discretion. *See State v. Stephenson*, 878 S.W.2d 530, 540 (Tenn. 1994). Moreover, unless there has been a clear abuse, the trial court's discretion in determining the qualifications of jurors is not subject to review. *See Lindsey v. State*, 189 Tenn. 355, 366-67, 225 S.W.2d 533, 538 (Tenn. 1949) ("The judges of the various circuit and criminal courts are of necessity given wide discretion in determining the qualification of jurors and their discretion is not subject to review 'except in cases where it is clearly made to appear it has been abused.'"). A trial court's finding of impartiality may be overturned only for "manifest error." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984); *Howell*, 868 S.W.2d at 248.

The defendant contends that it was error for the court not to excuse juror Shaddy for cause because she had formed an opinion that he was guilty and she did not unequivocally change that position. He further argues that the trial judge's efforts to rehabilitate the juror were improper.

During the voir dire, Shaddy indicated that she had prior knowledge of the case from both the newspaper and the news. She initially told the court that she had formed an opinion about the case. She stated that it would be hard to set her opinion aside and base her decision solely upon the evidence and the jury instructions. However, when further questioned by the court, the juror stated that she thought she could base a decision solely on the evidence and that she would listen to both sides and make a judgment from what she heard. She said she would be fair because she knew that everything she read in the paper was not true. The trial court denied the defendant's challenge for cause based on the juror's response that she could be fair.

Next, the defendant contends that the trial court erred in denying his challenge for cause as to juror Newbill. The juror said that he had heard about the trial from the newspaper and that he had seen the yellow tape at Wal-Mart. The juror also said he had personal opinions about illegal aliens in the country. He also said that his opinion was that the death penalty could not be applied in this case. He did indicate that if he were selected for the jury, he would put his personal feelings aside and listen to the testimony from each party. The defendant objected to the juror's inclusion in the jury panel, but the trial court denied the challenge for cause based on the juror's statement that he could be fair and listen to the evidence presented before making a decision.

The defendant also argues that the trial court improperly denied his challenge for cause as to juror Woodard. This juror said that she had read about the case in the paper at the time of the crime but could not remember many of the details. She said that she thought she could listen to all of the evidence to make her decision on whether the defendant was involved in the crime. The defendant challenged her for cause, but the trial court denied the challenge noting that, if the juror could not remember what she had read about the case, it was not enough to influence her.

Juror Woodard indicated that she might have a problem if she heard at trial that the defendant was an illegal alien. She said that if she did not know if he was an illegal alien, it would not matter. She did not have a problem that the defendant was Hispanic. The State informed the trial court that it did not anticipate the defendant's status as an alien to be part of the State's proof. The trial court denied the defendant's challenge for cause and stated that it would entertain a motion to excuse the juror if the defendant's status as an alien became an issue at trial.

The defendant also contested the seating of juror Branton because he indicated that he had heard about the case and had formed an opinion. The juror later indicated that he could set aside his opinions and base his decision solely on the evidence at trial and the jury instructions. The juror clarified that he knew the role of a juror was to base his decision on what he heard in the courtroom instead of what he read in the newspaper. There was an issue of whether this juror misstated his opinion that the defendant had to prove his innocence. The trial court specifically found that the juror later stated that the State had the burden of proof and interpreted the juror's comments that he was pointing out that it was an adversarial proceeding. The trial court denied the defendant's challenge to this juror.

The defendant also argues that the trial court erred in denying his challenge to juror T. Blackwell because he was a former law enforcement officer in a different state. The juror indicated that he would find a witness wearing a badge more credible. The trial court denied the challenge for cause because the juror indicated that he would follow the jury instructions on judging the credibility of witnesses.

The defendant also contends that it was error for the trial court to deny his challenge to juror A. Blackwell. He further argues that the trial court should have granted him an extra peremptory challenge to allow him to strike this juror. The following colloquy occurred with juror A. Blackwell:

| | |
|---|---|
| Juror: | My sister is a TBI Forensic Specialist. |
| Counsel: | What does she do? |
| Juror: | She is in the lab. She does all the stuff that CSI people do, I guess. |
| Counsel: | Now that you say Blackwell, the name is really familiar. What field particularly? Fingerprints. |
| Juror: | She does the blood. |
| Counsel: | Serology? |
| Juror: | -- and materials. |
| Counsel: | Does she talk to you about her work? |
| Juror: | Yeah. |
| Counsel: | Well, you have already heard that we are probably going to have some of that CSI stuff here and we are going to have some folks from the TBI Crime Lab up here testifying. Same kind of question. Do you think that is going to have an impact on your ability, particularly when the TBI folks are up here testifying and saying this is this and that is that? |
| Juror: | No. |
| Counsel: | With respect to your sister, do you see her on some kind of regular basis; talk to her on some kind of regular basis? |
| Juror: | Yes. |
| Counsel: | Going to have any - - I don't know how to ask this question. Obviously I am concerned that you are going to be talking with your sister and that I am not going to say your sister is on the prosecution side, but she is a part of that arm. That is why I am concerned that there may be some influence there on your ability to make decisions in this case, and here again, give credibility or take credibility away from people who are testifying. Are my worries far flung or is that potentially a problem? Only a question you can answer. |
| Juror: | It may be because I do believe everything she says because she is very educated. |
| Counsel: | Okay. |
| Juror: | So the people that are here are going to be very educated. |
| Counsel: | And those are her colleagues that she would work with; right? |
| Juror: | Yeah. |
| Counsel: | Can you tell the Court that you would not - - you are certain that you would not allow that to influence your decision here as a juror? |
| Juror: | No. |
| Counsel: | You cannot tell the Court that? |
| Juror: | No. |

Juror A. Blackwell was questioned by the court again in the following exchange:

| | |
|---|---|
| Court: | Ms. Blackwell, this is [Juror] Blackwell, number 11. You were asked some questions. Was it your sister who was in law enforcement? |

Juror:      Yes.  Sister is a forensic specialist.

Court:      Is that with the TBI?

Juror:      Uh-huh.

Court:      Is she on the witness list first off?  What is her name?

Juror:      [sister's name].

D.A.:       No.

Juror:      I think she told me who was coming.  I don't remember what she said.

Court:      Let me ask you this: Got kind of murky there to me.  You said she was very educated and because of that you would believe her more.  Let me just go back to a more basic question.  Is there any reason you cannot be a fair and impartial juror in this case?

Juror:      No, I don't think so, no.

Court:      Would you follow the Court's instructions and apply the instructions to the evidence you hear in the case and in deciding the case?

Juror:      Does that mean I have to be quiet?

Court:      No.

Juror:      I don't know if I can keep secrets from her if you know what I mean.

Court:      Not exactly.  Let me tell you this: You are not going to be able to discuss this case until it is over.  Once it is over you can talk about the case.

Juror:      I can?

Court:      If you are on the grand jury you can't discuss what happens on the grand jury.  This is different.  The secrecy part only applies until the case is over.  After that, you can talk - - you don't have to talk, but if you want to you can talk about it.  Does that help?

Juror:      Yeah.

Court:      I will give the lawyers a chance to ask you some questions.

Counsel:    Have you served on a jury before?

Juror:      No, sir.

Counsel:    That's all I have got.

D.A.:       Specifically with the other scientists from the crime lab, I imagine from you sister you know there are certain procedures that have to be used in handling that type of evidence and testing that kind of evidence.  As a juror you are going to listen, just like the other jurors, and if you had a question about the way the evidence had been handled or the way the evidence had been processed, then the simple fact that they work at the TBI lab, you wouldn't let them get away with anything if you found they had not done something properly with evidence, you would factor that in.

Juror:      Yeah.

D.A.:       You are not saying the TBI lab cannot do anything - -

Juror:      That is anybody.  Not just them.

Court:      You may re-take your seat, Ms. Blackwell.

Counsel:    I am renewing my motion.

Court:      I am going to respectfully deny that.  In her opinion she could be fair.

-9-

The juror stated that her sister would not have an impact on her ability to be a fair and impartial juror and that it would not influence her. The juror said that she would be a fair and impartial juror and the trial court denied the challenge on this basis. We note that the advisory commission comments to Tennessee Rule of Criminal Procedure 24 states:

> A prospective juror who has formed or expressed an opinion as to the merits of the case may still be qualified to serve, but only upon an unequivocal showing of impartiality. The commission disapproves of questions tending to lead the prospective juror or suggest partiality in the first instance, and also disapproves of that procedure in "rehabilitating" the prospective juror into vocalizing impartiality. Such a prospective juror shall be held to be qualified only upon a truly unequivocal showing of impartiality.

Tenn. R. Crim. P. RULE 24, Advisory Comm'n Cmts. Here, the juror made it clear that she would not absolutely believe any witness, including the "experts," if it was demonstrated that they had acted improperly. While the comments suggest that "rehabilitating" a juror's impartiality is not favored, this juror was not simply rehabilitated. The purpose of the further colloquy was to clarify her prior statements and in so doing, the witness made an unequivocal showing of impartiality. She was asked leading questions but affirmed her belief that she would be impartial. This defendant is not entitled to relief on this issue.

Next, the defendant argues that the trial court erred in removing a prospective juror over his objections. The juror told the court that she needed to be in another town for her granddaughter's graduation because the child's father would not be able to attend the graduation. The prospective juror said she would need to leave before a certain time, and the trial court released the juror. The defendant contends that releasing the juror was an abuse of discretion.

This court has previously determined that the trial court is in a better position than an appellate court to observe the demeanor, attitude, and body language of a potential juror from which the court may conclude the potential juror's capability of impartiality. *State v. Lorenzo Malone*, No. M2003-02770-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 651, at **8-9 (Tenn. Crim. App. at Nashville, June 27, 2005). Unless there has been a clear abuse, the trial court's discretion in determining the qualifications of jurors is not subject to review. *See Lindsey*, 189 Tenn. at 366-67, 225 S.W.2d at 538. The defendant has failed to show that the trial court abused its discretion and failed to show any reversible error in this case. "[I]rrespective of whether the trial judge should have excluded the . . . challenged [juror] for cause, any error in this regard is harmless unless the jury who heard the case was not fair and impartial." *Howell*, 868 S.W.2d at 248 (citing *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989)). The "failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him." Howell, 868 S.W.2d at 248. The defendant in the instant case apparently exhausted all his peremptory challenges and sought an additional challenge to contest juror A. Blackwell. However, that juror told the trial court that she would be fair and impartial. The record

-10-

does not support the defendant's position that an unfair or impartial juror was forced upon him. Therefore, he is not entitled to relief on these issues.

Next, the defendant argues that the trial court improperly allowed testimony from the State's witness, Agent Wesson, regarding the fact that criminal interview subjects frequently minimize their involvement in crimes. The defendant further argues that the statements were irrelevant and speculative. The admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court, and this court must review the trial court's evidentiary rulings for an abuse of discretion. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Gray*, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997).

Tennessee Rule of Evidence 401 states that "'[r]elevant evidence" is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 states that "[a]ll relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid. Rule 401, 402.

The State asked Agent Wesson if he was trained to use certain techniques when he interviewed a suspect. The witness testified that one or more of those techniques included telling the suspect something that you think they want to hear even though it might not necessarily be true. The State also asked the witness whether it was common for some suspects to minimize their role in a crime. The witness answered in the affirmative. The defendant objected and stated that it was an improper statement. The trial court overruled the objection because the question was relevant and not speculative if the witness was basing it on his experience. The witness was not permitted to testify specifically as to whether the defendant attempted to minimize his own involvement in the underlying crimes. This evidence was relevant and properly admissible. The trial court did not abuse its discretion in admitting the testimony.

Next, the defendant argues that the trial court erred in denying his motion for a mistrial based upon the assistant medical examiner's testimony regarding blood pattern. Specifically, he contends that the testimony exceeded the witness's area of expertise.

The decision of whether to grant a mistrial is a matter within the discretion of the trial court and will not be disturbed on appeal absent a demonstration that the trial court abused its discretion. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). Generally, a mistrial will only be declared "if there is a manifest necessity requiring such action by the trial judge." *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "If it appears that some matter has occurred which would prevent an impartial verdict from being reached, a mistrial may be declared." *Id*.

During the testimony of the assistant medical examiner that conducted the autopsy of the victim, the defendant objected to a statement by the witness regarding the blood pattern found on the

victim's arm. In an offer of proof, the witness testified that the victim had several dried streaks of blood that ran down his arm. He opined that this dried blood did not run while the victim was face down. It was likely that the blood pattern occurred while the victim was either standing up or on his back. The witness testified that once the carotid artery was slashed, the victim would have bled profusely and quickly but there was a small amount of blood on the victim's body. He concluded that the victim would not have been on his back when he received the wound on the left side of his neck. It was possible that he was face down when he sustained the fatal wound. According to the witness, the wound on the victim's arms occurred prior to the neck wound. The doctor testified that he believed he was qualified to render those opinions based on his recognition of being an expert in the field of forensic pathology. As a result, the trial court overruled the objection and allowed the witness to testify on the issue of blood pattern. On appeal, the defendant has not demonstrated that the trial court abused its discretion in denying the mistrial. Therefore, he is not entitled to relief on this issue.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgments from the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE