IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 28, 2010

## AYATOLLAH WILLIAM WALLACE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Bradley County**
**No. M-09-191  Carroll Ross, Judge**

_____

**No. E2009-02208-CCA-R3-PC - Filed July 9, 2010**

_____

A jury convicted the petitioner, Ayatollah William Wallace, of three counts of aggravated kidnapping. The trial court sentenced him to an effective sixteen-year sentence in the Tennessee Department of Correction. On direct appeal, this court upheld the convictions and sentences. The petitioner filed a petition for post-conviction relief alleging the ineffective assistance of counsel at trial and on direct appeal. The Criminal Court for Bradley County denied post-conviction relief, and the petitioner now appeals. Following a review of the parties' briefs, the record, and applicable law, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

David K. Calfee, Cleveland, Tennessee, for the appellant, Ayatollah William Wallace.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Background

A grand jury indicted the petitioner, Ayatollah William Wallace, on charges of especially aggravated kidnapping, aggravated robbery, aggravated burglary, and aggravated assault. The facts of the cases, as summarized by this court on direct appeal, are as follows:

Amy Ashe testified that on December 18, 2003, she was separated from her husband, the late Dennis Allen Ashe. Ms. Ashe went to her husband's apartment to confront him after learning that another woman had been seen entering the apartment. Mr. Ashe refused to allow her into the apartment so she went across the street "to spy." She saw two black males and a white male approach the apartment; the black males entered while the white male remained outside. A few minutes later, one of the black males emerged and spoke with the white male, then both entered the apartment.

Ms. Ashe returned to the apartment and, as she approached the door, heard muffled screaming and sounds of a struggle. Mr. Ashe opened the door, pulled his wife into the apartment, and told the three men, "My wife is here now, you all just need to please leave, just please leave." Ms. Ashe later learned that the three men were Patrick Lee Jones, Timothy Saxe, and the [petitioner]. She noticed that Mr. Ashe's pants were on wrong side out and his shirt was torn and saw Melissa Moats sitting on the couch crying. Ms. Ashe testified that the [petitioner] and Jones both had knives; Jones' knife was five to six inches long. The [petitioner] told Jones that no one was to leave and then forced Mr. Ashe to go upstairs with him. While the [petitioner] and Mr. Ashe were upstairs, Ms. Ashe heard Mr. Ashe tell the [petitioner] that he did not have any money, to which the [petitioner] repeatedly replied, "You owe me $450.00 and you are a narc and narcs get dealt with." Mr. Ashe then said, "Stop it man, stop it. What's wrong with you? Stop it. Why do I owe you money, what do I owe you money for? If I owe you money then what do I owe it to you for?" Ms. Ashe began crying and asked Jones and Saxe to allow her to leave to see her son, but they refused. Saxe approached her and punched her on the arm. Then the [petitioner] and Mr. Ashe descended the stairs in a struggle, and Ms. Ashe noticed that Mr. Ashe was bleeding from his neck. Mr. Ashe attempted to dial 9-1-1, but Jones removed the phone cord from the wall and cut it. The [petitioner] then forced Mr. Ashe back upstairs. Shortly thereafter, Officer Parks of the Cleveland Police Department arrived, and Ms. Ashe told him that the [petitioner] was holding Mr. Ashe upstairs. As Officer Parks ascended the stairs to investigate, Jones and Saxe ran out the front door.

On cross-examination, Ms. Ashe testified that none of the three men forced their way into the apartment. She said she was not living with her husband at the time of the incident because he had a drug problem. She testified that later on the night of the incident she identified Jones and Saxe from a physical line-up, and several months later she identified all three men in a photographic line-up.

Melissa Moats testified that she knew Dennis Ashe because they used drugs together. She said she "[p]artially" remembered the evening of December 18, 2003, and was "pretty drunk" at the time. That night, she was visiting Mr. Ashe to buy drugs when she heard a knock on the door. She testified that Mr. Ashe answered the door, there was a commotion, and a black male came upstairs and dragged her down the stairs by her hair, holding a knife to her throat. She said a white male blocked the door as a second black male detained Mr. Ashe with a knife. As the men argued, Ms. Ashe came to the door and the men allowed her inside. Ms. Moats testified that she did not try to leave because she was afraid. On cross-examination, she acknowledged that she did not remember how she arrived at Mr. Ashe's apartment or what time the events in question took place.

Timothy Saxe, a codefendant, testified that he pled guilty to kidnapping charges and was sentenced to eight months in jail and probation in return for his truthful testimony about the events of December 18, 2003. He said the [petitioner] and Jones picked him up from his house and told him they were going to get some marijuana. When the three men arrived at Mr. Ashe's residence, he waited outside while the other two searched Mr. Ashe's truck and entered the apartment. After approximately ten to fifteen minutes, Saxe walked inside and heard the [petitioner] yell, "You owe me money," and Mr. Ashe reply, "I don't know what you are talking about, I don't owe you no money." Jones searched the apartment while the [petitioner] hit Mr. Ashe in the face, demanding money. When Ms. Ashe knocked on the door, the [petitioner] was on top of Mr. Ashe, strangling and hitting him. Ms. Ashe attempted to separate the two men, but Saxe pulled her away. When the police arrived, Saxe ran out the front door.

Saxe recalled that both Jones and the [petitioner] carried knives that night. He testified that the victims appeared scared and tried to leave, but Jones would not let them. He said he had no role in the incident and was only there to buy drugs. On cross-examination, Saxe testified that he carried a pocketknife with him that night but did not display it. Although unsure, he said he believed Mr. Ashe allowed Jones and the [petitioner] into the apartment and that they did not force their way in.

Officer Bill Parks of the Cleveland Police Department testified that he was called to Mr. Ashe's apartment on December 18, 2003, to investigate a disconnected 9-1-1 call. When he arrived, he saw two males to his right and

two females sitting on a couch. He recognized Ms. Ashe, who said, "He's upstairs with Allen [Ashe]." Mr. Ashe then emerged from upstairs and said, "Get him, get him, it's Black FN1 . . . he's getting out the window." Officer Parks ascended the stairs as the two males to his right exited through the front door. When he arrived upstairs, the bedroom window was open, but he did not see anyone. He ran down the stairs and outside and embarked on a foot pursuit with Officer Steve Ross. The two officers apprehended Saxe, and Officer Parks was returning to the apartment complex when he noticed a dark purple car he had seen the [petitioner] driving previously. He discovered the [petitioner] hiding inside the vehicle and took him into custody.

> FN1. Saxe's testimony indicated that the [petitioner] is also known as "Black."

Detective Kevin Felton of the Cleveland Police Department testified that he observed a patrol officer conduct a "show-up" at the crime scene in which Mr. and Ms. Ashe identified the [petitioner] and Saxe as two of their assailants. He later displayed a photographic line-up to Ms. Ashe from which she identified Jones as the third assailant.

The [petitioner] testified that on the day of the incident he received a call from Mr. Ashe, who wished to purchase drugs from him. He went to Mr. Ashe's apartment, sold him cocaine, and left. He later received a second phone call from Mr. Ashe requesting more drugs and asked Jones to drive him back to Mr. Ashe's apartment; they picked up Saxe on the way. When the three arrived at the apartment complex, Ms. Ashe was standing outside and accompanied Mr. Ashe and the [petitioner] into the apartment. The [petitioner] testified that Mr. and Ms. Ashe began arguing about Ms. Moats. He took Mr. Ashe aside and asked for payment for the drugs he previously delivered. Mr. Ashe first responded that he did not have any money and then told the [petitioner] his money was upstairs. When he and Mr. Ashe went upstairs to retrieve the money, the [petitioner] heard Jones say, "Black, police out here." He jumped out of the bedroom window because he was carrying an ounce of cocaine. The [petitioner] testified that he did not carry a knife to Mr. Ashe's apartment that night.

After deliberation, the jury found the [petitioner] guilty of the aggravated kidnappings of Dennis Allen Ashe, Amy D. Ashe, and Melissa Kay Moats. The trial court sentenced him on each count to sixteen years in the Department of Correction, with all three sentences to be served concurrently.

-4-

*State v. Ayatollah W. Wallace*, No. E2007-00150-CCA-R3-CD, 2008 WL 341445, at *1-3 (Tenn. Crim. App. at Knoxville, Feb. 7, 2008), *perm. app. denied*, (Tenn. 2008).

The petitioner appealed his convictions to this court arguing that in light of *State v. Anthony*[1], this court must overturn his convictions. *Id.* at *1. This court affirmed the petitioner's convictions, and the Tennessee Supreme Court denied the petitioner's application for permission to appeal on June 30, 2008. *Id.*

On April 13, 2009, the petitioner timely filed a pro se petition for post-conviction relief alleging that he received ineffective assistance of counsel, he was denied a speedy trial, and he was denied the right to confront witnesses. The court appointed post-conviction counsel for the petitioner, and post-conviction counsel filed an amended petition for post-conviction relief. In the amended petition, the petitioner again alleged that he received ineffective assistance of counsel, was denied a speedy trial, and was denied the right to confront witnesses. The Criminal Court for Bradley County held a hearing on the petition for post-conviction relief, and the parties presented the following evidence.

Trial counsel A[2] testified that he worked for the public defender's office and was one of the attorneys who tried the petitioner's case at the circuit court level. He had co-counsel, trial counsel C, who tried the case with him. Trial counsel A remembered the general facts of the petitioner's case, but he did not remember much about the trial. Trial counsel A recalled that the petitioner had several cases pending leading up to the trial for the present case and was on bond several times. He met with the petitioner several times at the courthouse. Trial counsel A stated that "there was a lot of negotiation between [himself] and the State's attorney trying to resolve this case, along with a number of other cases [the petitioner] had pending." Because of these negotiations, he communicated with the petitioner "quite a bit."

Trial counsel A could not specifically recall whether he and co-counsel had access to witness statements while preparing for the case but said he was sure they did because they had all of the discovery provided by the state. Trial counsel A recalled speaking with the

---

[1] *State v. Anthony,* 817 S.W.2d 299, 306 (Tenn. 1991) (precluding dual convictions for kidnapping and another accompanying felony when the movement or confinement supporting the kidnapping charge is "essentially incidental" to that required to commit the accompanying felony), *abrogated by State v. Dixon,* 957 S.W.2d 532 (Tenn. 1997).

[2] During his trial, the petitioner had four attorneys. Throughout this opinion, we will refer to them as trial counsel A, B, C, and D. On appeal, the petitioner had one attorney who we will refer to as appellate counsel.

petitioner numerous times about his charges, but he did not recall specific conversations. Trial counsel A did not recall any issues with jury selection, and he did not remember why he did not represent the petitioner during the sentencing hearing. Trial counsel A likewise could not recall if he argued the motion to fingerprint the knife or why counsel continued the case several times. However, he stated that if he "was involved in the continuance, it was something to do with negotiating a resolution of this case as well as the other pending cases."

On cross-examination, trial counsel A testified that the petitioner had charges in both state and federal courts and was facing a substantial amount of jail time. According to counsel, the petitioner "was in a desperate situation" in federal court. Trial counsel A said that he was not aware that he had abandoned any issues at trial or that he did not use statements that could have impeached two witnesses' testimony. Trial counsel A stated that the jury did not convict the petitioner of "the top charge," but instead, they convicted the petitioner of a lesser included offense. Trial counsel A agreed that he delayed the petitioner's trial in part because he was "trying to get . . . a package deal for [the petitioner] to limit his exposure, and the possibility of consecutive sentencing."

Upon further examination, trial counsel A stated that he did not recall filing a motion for a speedy trial but said that if the petitioner had asked for such a motion, he would have filed it. Trial counsel A testified that he counseled the petitioner on "consecutive sentencing, not getting a package deal, [and] forcing the State into trials that [could] then be used to enhance in subsequent prosecutions."

Trial counsel B testified that he took issue with law enforcement's failure to fingerprint the knife. When law enforcement testified at the petitioner's trial, trial counsel B cross-examined them about the issue. He stated that the petitioner's defense team agreed that having the knife fingerprinted was a "double-edged sword" because if the petitioner's fingerprints were on the knife it "would have been devastating" to his case, and if the test was inconclusive, then law enforcement could argue that they tried to test the knife. He further stated that "without [law enforcement] even trying, it [gave him] a pretty hard argument that they didn't do a very good job on the case." Trial counsel B said that he had successfully attacked law enforcement investigations during his time as a prosecutor and a criminal defense attorney.

Trial counsel B thought the *Anthony* case was important because the issue was not only whether the state could proceed with both charges but also the state "choosing the more serious crime over the less serious crime. . . ." He agreed that the defense's argument at trial and on appeal was that "the State abused its discretion and the Judge should have ruled that they abused their discretion by allowing them to go on the more serious charge."

-6-

On cross-examination, trial counsel B stated that during jury selection, there was only one[3] African American in the jury pool, and that potential juror "was set so far back in the pool that relatively, [they] were never going to get to that person" even if both parties used all their challenges. He further stated that the only way they could have gotten to that juror was if the parties made several for cause challenges to jurors. Trial counsel B thought he made a motion for a mistrial during jury selection. He recalled that after the defense had exhausted all of their challenges, they discovered that a juror had failed to disclose that he knew one of the law enforcement officers and had also previously sat on a grand jury. The defense asked if the court would excuse that juror for cause, and the trial court denied their request. Trial counsel B agreed that the court asked the jurors if they believed that they could render a fair verdict based only on the evidence.

Trial counsel C testified that the petitioner had spoken to him about the knife more than once and recalled telling the petitioner that the state's theory was that the petitioner was the leader of the crime regardless of whether he had the knife. Trial counsel C said that there were two witnesses that were going to testify at trial that the petitioner had the knife. He also said that the state could convict the petitioner without his fingerprints being on the knife. Trial counsel C stated that when asking law enforcement for something to be done there was "always that concern . . . that you don't get the result that you want or expect." He further stated that defense counsel could argue to the jury what the state and investigators failed to do and that he had successfully made that argument in previous cases.

Regarding the continuances of the petitioner's trial, trial counsel C recalled that the petitioner failed to appear for a trial date, which caused a continuance. Trial counsel C also recalled working with the state to resolve this case and three subsequent drug cases in state court to prevent the state from presenting the petitioner's drug cases to the federal court. Trial counsel C was concerned that the federal court would sentence the petitioner to a mandatory prison sentence if convicted in the drug cases. Trial counsel C recalled discussing with the petitioner whether he would plead guilty to the robbery and kidnapping charges to which the sentences for the drug cases would run concurrently.

Trial counsel C did not recall having the petitioner execute a waiver of appearance for his sentencing hearing. He stated that the state gave notice that the petitioner was a Range II multiple offender. He further stated that he was unaware of any bases to object to the court's considering the petitioner's prior criminal history or the court's finding that the petitioner was the leader in the commission of the crimes.

_____

[3] During the post-conviction hearing trial counsel B stated that there was one African American potential juror, however, during the motion for mistrial, trial counsel B stated that "over the entire panel of possible jurors there's not a single African[]American out there . . . ."

Trial counsel C had several pending appeals and asked appellate counsel to handle the petitioner's appeal. Trial counsel C said that appellate counsel had never appealed a case. He gave the petitioner's file to appellate counsel and discussed the appeal with him. He stated that defense counsel normally raises the issue of sufficiency of evidence after an adverse jury verdict; however, he said that he has had "very little success appealing on the sufficiency of the evidence." Trial counsel C could not recall whether he advised appellate counsel to raise the sufficiency of the evidence on appeal and said that was his mistake and not appellate counsel's. He said that he did not raise the issue of the trial court's denial of the motion to fingerprint the knife because he "made the decision that it was within the Court's discretion, and that it would have to be a showing of abuse of discretion to win that issue on appeal, so [he] didn't think that [the] issue would have merit . . . ."

Trial counsel C agreed that he made strategic decisions when trying cases. When making these decisions he takes his clients' wishes into account, but he also has an ethical duty to defend his clients to the best of his ability. He testified that his decision to not have the knife fingerprinted was strategic. The petitioner was persistent that counsel file the motion; however, trial counsel C "was concerned about the result," and he "knew what the proof was going to be."

On cross-examination, trial counsel C stated that he represented the petitioner in general sessions court, and the court reappointed him in criminal court. Trial counsel C assigned the case to trial counsel A, and trial counsel B assisted him with the case. Trial counsel C explained that he made the decision to allow them to try the case because of trial counsel B's experience as a prosecutor and public defender. Trial counsel D represented the petitioner in his drug cases, and she also became involved in the present case.

Trial counsel C agreed that counsel argued the motion to fingerprint the knife on April 4, 2005, and the case did not go to trial until July 2006. He stated that his office did not renew the motion after the trial court denied it because he had made the decision that they could proceed without having the knife fingerprinted. He stated that he thought the results of the fingerprinting would have been inconclusive because it would be hard for authorities to develop a latent print.

In addition to the petitioner's failure to appear, trial counsel C said that the court continued the case for over two years because the petitioner's subsequent charges slowed the trial process and the negotiations between defense counsel and the state. Trial counsel C said that he resumed representation of the petitioner at the sentencing hearing because trial counsel A and B had left the public defender's office. He did not recall the petitioner disputing the prior criminal history alleged by the state in their range notice. Trial counsel

C conceded that he should have objected to the allegation that the petitioner was the leader in the commission of the crimes; however, he also said that the trial judge heard the proof at trial and was in the best position to make that determination.

Trial counsel C did not recall the petitioner requesting a speedy trial, and he did not think that the issue of whether the petitioner had a speedy trial would be meritorious on appeal. He recalled that Mr. Ashe being deceased at the time of trial concerned the petitioner, but he stated that the state dismissed the aggravated robbery charge. Trial counsel C did not argue the issue of the juror that remained on the panel after counsel asked the court to dismiss him because counsel did not raise the issue in the motion for new trial. He did not remember the petitioner expressing concern about counsel's failure to raise the jury issues on appeal. He recalled that the petitioner was concerned about the fingerprint motion after he had perfected the appeal and provided the petitioner with a copy of the appellate brief.

Trial counsel C said that at the trial level, counsel A and D argued a pretrial motion, which the trial court denied, that requested that the state dismiss the aggravated kidnapping charge because the confinement that occurred was only what was necessary to commit the alleged robbery. Trial counsel C stated that case law supported the motion, and he appealed the issue so this court could review the trial judge's decision for an abuse of discretion. After the state dismissed the aggravated robbery charge, it proceeded solely with the aggravated kidnapping charges. Counsel stated that he still pursued the issue on appeal because the defense's position was that the state should not have charged the petitioner with aggravated kidnapping and could only charge him with aggravated robbery. He agreed that the jury's verdict resolved that question; however, their motion was to have the court dismiss the robbery counts.

On redirect examination, trial counsel C testified that he should have objected to the trial court's finding that the petitioner was the leader in the commission of the crimes "for the benefit of [the petitioner.]" He further stated that the trial judge would have made an independent decision whether to apply that enhancement factor and that the court could have sentenced the petitioner to the maximum. Trial counsel C did not think that the sentence the trial court imposed was excessive considering the petitioner's record, and he did not choose to appeal the sentence. Trial counsel C stated that he appeals the issues with the most merit and that "appellants are not necessarily realistic about their opportunity on appeal."

Appellate counsel, an assistant public defender, testified that he handled the petitioner's case on appeal. While preparing for the petitioner's case, appellate counsel spoke with the petitioner over the phone, met with trial counsel C, and reviewed the court files and motions. Appellate counsel estimated that he spoke with the petitioner between

"half a dozen to a dozen times." He further estimated that he spoke with trial counsel C "[m]aybe a dozen to two dozen" times.

Appellate counsel did not recall discussing potential issues for appeal or how he would handle the case with the petitioner. However, he stated that he discussed the appeal with trial counsel C, and trial counsel C wanted him to appeal the *Anthony* issue because it "had the most merit and [it was] most likely to win the appeal." Appellate counsel was aware that counsel had already raised the issue during trial and that the state chose to proceed with only aggravated kidnapping charges. According to appellate counsel, "other issues were spoken of, but none were addressed in the appeal." He said that he was unaware of any issues with the jury. Appellate counsel stated that he discussed "the trial court's ruling on the fingerprinting motion" with trial counsel C, but he did not pursue that issue on appeal. Appellate counsel also stated that he and trial counsel C did not discuss the speedy trial issue, and he did not "think that was an issue."

On cross-examination, appellate counsel testified that the petitioner was aware that he was handling the appeal. Appellate counsel told the petitioner the issues for appeal, and the petitioner did not object or suggest additional issues. Appellate counsel did not discuss whether the appeal was frivolous and unlikely to succeed with trial counsel and stated that the Public Defender's Office did not "routinely file frivolous appeals."

Appellate counsel had tried approximately ten trials before he handled the petitioner's appeal, and he felt that he was competent to identify things that occurred in trial that could form the bases for an appeal. In other trials, appellate counsel had made the strategic decision to mention law enforcement's failure to do something, such as fingerprinting a knife, instead of requesting that they conduct a fingerprint analysis which could incriminate his client. Appellate counsel said that he had seen attorneys use this strategy successfully "on many occasions."

On redirect examination, appellate counsel could not recall whether the petitioner raised the fingerprint motion issue to him; however, he did recall that when the petitioner would call, he would either speak with appellate counsel or trial counsel regarding his appeal. Appellate counsel did not speak with the petitioner about a juror who had previously served on a grand jury and personally knew one of the officers involved in the case. Appellate counsel stated that, to his recollection, the first time he heard about the issue of whether there were African Americans on the jury panel was during the post-conviction hearing. He also did not recall the petitioner telling him that there were no African Americans on the jury. On recross-examination, appellate counsel said that while he was working on the appeal, the petitioner never mentioned the issue of a juror serving on a previous grand jury.

The petitioner testified that he had four attorneys during trial and one on direct appeal. The petitioner stated that he wanted the knife involved in his case fingerprinted because he "did not handle the knife." He raised the issue with trial counsel C and D and requested that they file a motion to have the knife fingerprinted. He first asked trial counsel C to file the motion in general sessions court; however, trial counsel C did not want to file the motion because a previous client requested a similar motion, and the evidence had that client's DNA on it. Ultimately, trial counsel D filed the motion shortly before trial. The petitioner was present for the motion hearing and understood that the court denied the motion "[b]ecause it was like too close to trial and . . . [trial counsel C] didn't want it to be done . . . ."

The petitioner said that there was only one African American juror for his trial, but she was "way in the back" and was not brought up for jury selection. The petitioner also said that one of the selected jurors knew the brother of a detective that had investigated his case.

The petitioner stated that trial counsel should have used the inconsistencies in Melissa Moats's statements and Amy Ashe's statement that the incident "was about drugs" during his trial.

The petitioner testified that the trial court continued his case ten times but did not recall if it was because trial counsel A was securing an offer from the state. He stated that he and trial counsel D were prepared for trial "numerous times," but the state requested a continuance. The petitioner stated that he was satisfied with how trial counsel A, B, and D handled his case and did not feel that they should have done anything more to prepare for trial. The petitioner did not know that trial counsel B represented him until the day of trial. The petitioner said that he did not meet with trial counsel while he was out on bond, and he only met with him when he was in court.

Trial counsel C represented the petitioner at the sentencing hearing, and the petitioner was not present.[4] The petitioner did not feel that there was anything more that trial counsel C should have done during the sentencing hearing, but he stated that

> because [trial counsel C] had my case since day one, from sessions court he
> was appointed to me and criminal court also. And I feel like . . . he had better
> knowledge of my whole case, and I feel like he should have been the one
> representing me instead of passing me on.

---

[4] Upon questioning from the court, the petitioner admitted that he was not present during his sentencing hearing because he refused to come to court that day. The petitioner agreed that he had the opportunity to be present and understood that he could have attended the hearing, but he chose not to be present.

According to the petitioner, trial counsel C told him that he did not handle his case on trial because he was preparing for an election. The petitioner testified that trial counsel D adequately explained his charges, and he "knew the seriousness of these charges and what [he] was facing . . . ."

The petitioner did not recall having any discussions with appellate counsel before appellate counsel filed his brief. He stated that he did not know appellate counsel represented him or what issues appellate counsel raised on appeal until he received notice that the court denied his appeal. After he discovered appellate counsel represented him, they talked "numerous" times over the phone. He stated that he did not talk to trial counsel C until after the appeal. After the appeal, he discussed with trial counsel C and appellate counsel why they raised the *Anthony* issue when trial counsel D had already addressed it in a motion in the trial court and asked counsel why they did not appeal the fingerprinting and jury issues.

On cross-examination, the petitioner testified that the trial court sentenced him to sixteen years for each count, which was in the middle of the sentencing range. The court ordered that he serve his sentences concurrently, and the petitioner agreed that the court could have ordered consecutive sentences. When the state charged the petitioner with especially aggravated kidnapping, they "ranged [him] up" to a Range II offender. The petitioner denied knowing that as a Range II offender he faced a possible twenty-five to forty-year sentence if the jury convicted him. The petitioner agreed that the jury convicted him of a lesser included offense, and they did not convict him of the "top charge."

When asked, on redirect examination, why he did not attend his sentencing hearing, the petitioner said,

> [I]t was just something I felt like I shouldn't have to be there, because . . . I know how I would have acted, because I feel like there's some things that went on at trial, as far as the jury and a lot of other things, that I don't feel like it would have been in my best interest.

The petitioner said that he discussed his decision not to be present during sentencing with trial counsel C, and the petitioner signed a waiver which indicated he did not wish to be present.

After hearing the testimony, the post-conviction court denied post-conviction relief finding that the petitioner failed to show that counsel was ineffective at trial or on appeal. The petitioner appeals the court's denial of post-conviction relief.

## Analysis

### 1. Ineffective Assistance at Trial

On appeal, the petitioner argues that trial counsel[5] was ineffective for (1) not filing the motion to have law enforcement fingerprint the knife until shortly before his trial, and (2) failing to object to the enhancement factors introduced at the sentencing hearing. The state responds that trial counsel made a tactical decision to not pursue the fingerprinting motion and the enhancement factors presented were applicable to the petitioner. We agree with the state.

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations of fact set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is *de novo* with a presumption that the findings are correct. *See id.* Our review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

To establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland* at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate

---

[5] During the hearing on the petition for post-conviction relief, the petitioner stated that he was satisfied with the performance of trial counsel A, B, and D; however, in his petition for post-conviction relief and appellate brief, the petitioner does not distinguish which trial counsel was insufficient. We will presume that the petitioner is alleging ineffective assistance of all of his trial counsel.

preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Id*. at 697; *see also Goad*, 938 S.W.2d at 370 (Tenn. 1996). If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Strickland*, 466 U.S. at 697.

The petitioner contends that trial counsel's handling of the motion to fingerprint the knife amounted to ineffective assistance. Specifically, he argues that the trial court's denial of his motion to have the knife fingerprinted was based in part on trial counsel's delay in filing the motion. He also argues that "the finger print motion is indicative of the lack of meaningful communication between [the petitioner] and counsel during the preparation and conduct of trial." Finally, the petitioner asserts that trial counsel was ineffective for not renewing the motion to have the knife fingerprinted after the trial court continued the case.

The petitioner asked trial counsel multiple times to file a motion to have the knife fingerprinted. Counsel testified that they were apprehensive about filing the motion because either the petitioner's DNA would be present on the knife or the test would be inconclusive and take away the defense argument that law enforcement's investigation was inadequate. Further, counsel testified that having the knife fingerprinted was unnecessary because there were eyewitnesses who stated that the petitioner had the knife, and the state could prove their case without the petitioner's fingerprints on the knife. The post-conviction court found that there was overwhelming proof at trial that the petitioner committed the crimes, the jury verdict resolved any issues of fact, and the petitioner may not second-guess counsel's reasonably based trial strategy. The evidence does not preponderate against the findings of the post-conviction court. We conclude that the petitioner has not shown that counsel's belief that the fingerprinting motion was unnecessary and the resulting failure to timely file the requested motion fell below the objective standard of reasonableness. Likewise, the petitioner has not shown that but for counsel's failure to file the motions, the outcome of the trial would have been different.

Next, the petitioner argues that trial counsel C should have objected to the court's consideration of his prior criminal history and his role as the leader in the commission of the crimes as enhancement factors. The trial court sentenced the petitioner on each count to a sixteen-year sentence to be served concurrently. The petitioner chose not to attend the sentencing hearing because he feared that he would have an outburst while in the courtroom; however, he stated that there was nothing more that trial counsel should have done during

the sentencing hearing. Trial counsel C conceded that he should have objected to the court's consideration of enhancement factors. Trial counsel C stated that the petitioner did not dispute his criminal history, and counsel thought the trial judge was in the best position to make the determination of applicable enhancement factors. The post-conviction court did not make a specific finding as to this issue, but the court found that, overall, the petitioner's counsel was not deficient. The petitioner has not alleged on what legal basis trial counsel C could have objected. Furthermore, the court sentenced the petitioner to an effective sixteen-year sentence, which is the mid point of the sentencing range, and the petitioner has not shown how the application of the sentencing factors prejudiced him. Accordingly, we find that this issue is without merit and the petitioner is not entitled to relief.

*2. Ineffective Assistance on Appeal*

The petitioner further argues that appellate counsel was ineffective for only raising the *Anthony* opinion on appeal. The state replies that counsel was not necessarily ineffective for unsuccessfully pursuing the *Anthony* issue on appeal, and the petitioner cannot show that counsel would have succeeded in pursuing the other issues.

The same principles that apply determining whether trial counsel was ineffective apply when determining the effectiveness of appellate counsel. *Campbell v. State*, 904 S.W.2d at 594, 596 (Tenn. 1995). A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful. *See e.g.*, *State v. Robbins*, 528 U.S. 259, 285 (2000). If a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, the reviewing court must determine the merits of the issue. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004). If an issue has no merit or is weak, counsel's performance will not be deficient for failure to raise it, and the petitioner will have suffered no prejudice. *Id*. Appellate counsel is not constitutionally required to raise every conceivable issue on appeal, and the determination of which issues to raise is generally within counsel's sound discretion. *Id*. "[A reviewing court] should not second-guess such decisions, and every effort must be made to eliminate the distorting effects of hindsight. Deference to counsel's tactical choices, however, applies only if such choices are within the range of competence required of attorneys in criminal cases." *Id*. (citations omitted).

The petitioner contends that appellate counsel was ineffective for pursuing only the *Anthony* issue on appeal despite the numerous issues that arose during trial. The petitioner alleges appellate counsel should have raised the issues of only one African American sitting on his jury and the court's failure to dismiss a juror who knew an investigating officer and had previously sat on a grand jury.

Because the petitioner's claim of ineffective assistance of counsel is based on the failure to raise particular issues, we must determine the merits of the issues. We note that the record on appeal only contains the transcript of the post-conviction proceeding and is void of the jury voir dire and trial transcript. It is the duty of the petitioner to provide a record that conveys a fair, accurate, and complete account of what transpired with regard to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b); *see State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999). Ordinarily, without an adequate record we would be unable to review the merits of the omitted issues, and we would "presume that the trial court's ruling was adequately supported by the record." *State v. Beech*, 744 S.W.2d 585, 588 (Tenn. Crim. App. 1987). However, "[t]he rule has long since been firmly established in this State that a Court may take judicial knowledge of facts which it has learned in an earlier hearing of the same case and of what it has done at a previous hearing of that case." *Pruitt v. State*, 460 S.W.2d 385, 395 (Tenn. Crim. App. 1970). The Post-Conviction Procedure Act contemplates a petitioner filing only one petition for post-conviction relief. *See* Tenn. Code Ann. § 40-30-102(c). In this case, the Assistant District Attorney General, at the start of the evidentiary hearing, presented the trial record which he had obtained from the appellate court archive. The post-conviction judge, who was also the trial judge, indicated that he had his extensive notes from the trial and opined that his own recollection, as supported by his notes, afforded him adequate knowledge of the trial. Thus, the trial judge had the opportunity to be informed about the trial proceedings. In light of this, and because this is the petitioner's sole chance to appeal the denial of his petition for post-conviction relief, we will take judicial notice of the record on direct appeal, which contained the transcript of the jury voir dire, and we will review the issues that the petitioner claims counsel should have pursued on appeal.

The petitioner first argues that appellate counsel was ineffective for failing to raise on appeal the issue of his jury pool containing only one African American. During jury selection, there was one African American juror in the pool of potential jurors, and trial counsel B testified that this juror was "so far back in the pool that relatively, [they] were never going to get to that person." Trial counsel B had used all available challenges and moved the court to declare a mistrial because "over the entire panel of possible jurors there's not a single African[]American out there, and [his] client is an African American."

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to a jury from "the county in which the crime shall have been committed." *See State v. Upchurch*, 620 S.W.2d 540, 542 (Tenn. Crim. App. 1981). Moreover, a criminal defendant has a constitutional right to a jury drawn from a venire that represents a fair cross-section of the community. *State v. Bell*, 745 S.W.2d 858, 860 (Tenn. 1988) (citing *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975)). To establish a prima facie violation of the

-16-

right to have a jury that is selected from a fair cross-section of the community, the petitioner must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
> (3) that this under[-]representation is due to the systematic exclusion of the group in the jury-selection process.

*State v. Nelson*, 603 S.W.2d 158, 161 (Tenn. Crim. App. 1980) (quoting *Duren v. Missouri*, 439 U.S. 357, (1979)). One does not have a constitutional right to be tried by a jury wholly or partially composed of persons of his or her own race. *Harvey v. State*, 749 S.W.2d 478, 481 (Tenn. Crim. App. 1987); *see also Wheeler v. State*, 539 S.W.2d 812, 815 (Tenn. Crim. App. 1976). The bare fact that an African-American defendant was tried by a jury of Caucasian jurors does not violate any right. *Harvey*, 749 S.W.2d at 481.

As to the first prong, the petitioner automatically satisfies it because African Americans clearly represent a distinctive group in the community. *State v. Mann*, 959 S.W.2d 503, 535 n. 24 (Tenn. 1997). Regarding the other prongs, the petitioner failed to offer any proof as to how the court conducted the venire selection process or any evidence on the proportion of African Americans in the population from which the court drew the venire. He simply argues that there was a lack of African Americans on the jury, and the petitioner is African American. Moreover, the petitioner did not offer any proof that the under-representation of African Americans on the venire from which the parties drew his jury was due to a systematic exclusion of African Americans. The petitioner's claim regarding the lack of African Americans on his jury is without merit. Accordingly, we conclude that counsel's performance was not deficient for failing to raise the issue on appeal, and the petitioner suffered no prejudice because of counsel's failure to raise the issue.

Next, the petitioner contends that counsel should have raised on appeal the issue of the trial court's failure to dismiss a juror who knew an investigating officer in this case and had previously sat on a grand jury. According to trial counsel B, after they had exhausted all of their peremptory challenges, the defense discovered that the juror had failed to disclose that he knew one of the investigating officers in this case and that he had previously sat on a grand jury. The defense asked if the court would excuse that juror for cause, and the trial court denied their request.

Rule 24(b) of the Tennessee Rules of Criminal Procedure governs challenges to potential jurors for cause and, in pertinent part, states, "Any party may challenge a prospective juror for cause if . . . there exists any ground for challenge for cause provided by law; [or] the prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror." We note that a trial court has wide discretion in ruling on the qualifications of jurors. *State v. Kilburn*, 782 S .W.2d 199, 203 (Tenn. Crim. App. 1989). The ultimate goal of voir dire is to ensure that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire rests within the sound discretion of the trial court. *State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993). Moreover, unless there has been clear abuse, the trial court's discretion in determining the qualifications of jurors is not subject to review. *Lindsey v. State*, 225 S.W.2d 533, 538 (Tenn. 1949).

During the voir dire, the following colloquy ensued:

[JUROR]: I think I failed to mention that I've been acquainted with Kevin Felton.
THE COURT: Okay. Is it a casual acquaintance?
[JUROR]: Yeah, I just knew him, and then I was on the grand jury.
THE COURT: Okay. Well, the fact that you know him, would that have any influence, if you felt the state didn't prove their case would you have any hesitancy to return a not guilty verdict?
[JUROR]: No
THE COURT: Okay. The fact that you have the knowledge of knowing him it wouldn't affect your decision one way or the other?
[JUROR]: No
. . . .
[TRIAL COUNSEL B]: The fact that you know these people and had that grand jury experience, can you set all that aside?
[JUROR]: Yes.
[TRIAL COUNSEL B]: And if you was [sic] to find the government hadn't proved its case beyond a reasonable doubt that you could find him not guilty?
[JUROR]: Yes.
[TRIAL COUNSEL B]: And you would make the government prove that?
[JUROR]: Yes.
[TRIAL COUNSEL B]: And you set [sic] on a grand jury before?
[JUROR]: Yes.

The trial court refused to strike the potential juror for cause based upon the juror's acquaintance with Detective Felton and prior participation on a grand jury.

After reviewing the answers of the juror, we conclude that the trial court did not err by failing to remove him for cause. The juror stated that his knowing Detective Felton would not influence his decision in this case nor would it affect his ability to find the defendant guilty if the state proved its case beyond a reasonable doubt. He also confirmed that he would set aside knowing Detective Felton and his previous grand jury experience and make the state prove its case. The petitioner has not established that the trial court's determination was erroneous. In addition, we note that the petitioner has failed to show that the alleged error prejudiced his case. "[I]rrespective of whether the trial judge should have excluded the . . . challenged [juror] for cause, any error in this regard is harmless unless the jury who heard the case was not fair and impartial." *Howell*, 868 S.W.2d at 248 (citing *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989)). The issue of the trial court failing to exclude the juror has no merit. Thus, counsel's performance was not deficient for failure to raise the issue, and the petitioner suffered no prejudice. Accordingly, the petitioner is not entitled to relief on the issue.

## Conclusion

Based on the foregoing, we affirm the judgment of the post-conviction court.

_____
J.C. McLIN, JUDGE